## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA EAGLE, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  11-4303 |
| SANDI MORGAN, HAITHAM SAEAD, | : | |
| JOSEPH MELLACI, ELIZABETH | : | |
| SWEENEY, LISA ARNSPERGER, | : | |
| QAMAR ZAMAN, and EDCOMM, INC., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S. J.                                          December 22, 2011

Currently pending before the Court is Motion by Plaintiff Linda Eagle ("Plaintiff" or "Dr.

Eagle") to Dismiss the Counterclaims of Defendant Edcomm, Inc. ("Edcomm").  For the following

reasons, the Motion is granted in part without prejudice and denied in part.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

According to the Complaint, Plaintiff Linda Eagle holds a Ph.D. in communication and

psychology and has extensive experience in the fields of financial services and training.  (Compl. ¶

11.)  In 1987, Dr. Eagle and a man named Clifford Brody founded Edcomm, Inc. ("Edcomm") to

provide such services, and were later joined as co-owners by David Shapp.  (Id. ¶ 12.)  Dr. Eagle

maintains a prominent reputation in the field of banking training and has cultivated relationships

with thousands of individuals and organizations.  (Id. ¶ 13.)  She has invested time, effort, and

money in developing her reputation in the financial education industry by speaking at conferences,

publishing in journals, magazines and newspapers, and traveling around the world to meet banking

leaders.  (Id. ¶ 14.)

In 2008, Dr. Eagle established an account on LinkedIn, which is a professional network on the Internet.  (Id. ¶¶ 15-16.)  Other LinkedIn users with whom a particular user has connected are referred to as that user's "connections" and users can "recommend" their connections to others.  (Id. ¶ 23.)  A user's profile also contains sections for associations, honors, and awards.  (Id. ¶ 24.)  When an individual creates a LinkedIn account, he or she must agree to the user agreement, which constitutes "a legally binding agreement with LinkedIn Corporation."  (Id. ¶ 20.)  Thus, information provided to LinkedIn is owned by the LinkedIn user, subject to the other terms of the User Agreement.  (Id. ¶ 25.)  Users can maintain only one LinkedIn account at a time.  (Id. ¶ 26.)  Dr. Eagle used her account to promote Edcomm's banking education services; foster her reputation as a businesswoman; reconnect with family, friends, and colleagues; and build social and professional relationships.  (Id. ¶ 17.)  Defendant Elizabeth Sweeney assisted Dr. Eagle in maintaining her LinkedIn account and had access to Dr. Eagle's password.  (Id. ¶ 17.)

On October 7, 2010, a company named Sawabeh Information Services Company ("SISCOM") entered into a term sheet with Edcomm, Dr. Eagle, Mr. Brody, and Mr. Shapp, wherein SISCOM purchased all of the outstanding common shares of Edcomm.  (Id. ¶ 27.)  Dr. Eagle, Mr. Brody, and Mr. Shapp originally remained employed as Edcomm executives, but, on June 20, 2011, they were involuntarily terminated by Defendant Mr. Haitham Saead.  (Id. ¶ 28.)  Just before the termination meeting, Mr. Brody changed his LinkedIn password.  (Id. ¶ 29.)  After the meeting, he changed his employment status to show he was no longer employed by Edcomm.  (Id.)  Dr. Eagle, on the other hand, did not make any changes to her LinkedIn account prior to her termination, but when she tried to access it later in the day on June 20, 2011, she could not.  (Id. ¶¶

2

30-31.)  The following day, Edcomm publicly announced that Defendant Sandi Morgan had been appointed Interim Chief Executive Officer of Edcomm, Defendant Joseph Mellaci had been named Vice President of Global Markets, and Qamar Zaman had been named Financial Controller.  (Id. ¶¶ 32-34.)

On June 20 or 21, 2011, at the Edcomm offices in Fort Washington, Pennsylvania, Defendants Morgan, Saead, Sweeney, Lisa Arnsperger, Joseph Mellaci, and Qamar Zaman allegedly attempted to access and hijack Dr. Eagle's and Mr. Brody's LinkedIn accounts.  (Id. ¶ 35.)  As noted above, Ms. Sweeney knew Dr. Eagle's password due to her assistance in maintaining Dr. Eagle's account.  (Id. ¶ 36.)  Ms. Sweeney purportedly provided the password to Mr. Saead and/or Ms. Arnsperger, then used the password to gain unauthorized access to Dr. Eagle's account.  (Id. ¶¶ 37-38.)  One of the foregoing individuals then changed the password so that Dr. Eagle could no longer access the account, and then changed Dr. Eagle's account profile to display Ms. Morgan's name and photograph.  (Id. ¶¶ 39-40.)  On the same date, Defendants also tried to hijack Mr. Brody's LinkedIn account.  (Id. ¶ 42.)  Ms. Sweeney, Mr. Mellaci, and Ms. Arnsperger allegedly contacted LinkedIn in an unsuccessful attempt to obtain Mr. Brody's new LinkedIn password.  (Id.)

As a result of the unauthorized access of Dr. Eagle's LinkedIn account, individuals searching for Dr. Eagle were routed to a LinkedIn page featuring Ms. Morgan's name and photograph, but Dr. Eagle's honors and awards, recommendations, and connections.  (Id. ¶¶  47-53.)  Plaintiff believes that Defendants used Dr. Eagle's account both to prevent her connections from reaching her, and to acquire business connections for the benefit of Ms. Morgan and Edcomm.  (Id. ¶ 54.)  In addition, they falsely represented that Dr. Eagle voluntarily resigned from Edcomm.  (Id. ¶ 55.)  The alleged misappropriation of the account has cost Plaintiff time, money, loss of good will, damage to

reputation, and diminution of the fair market value of her name.  (Id. ¶ 57.)  As of the date of the

Complaint, Defendants had refused to return Dr. Eagle's LinkedIn account to her.  (Id. ¶ 59.)

On June 17, 2011, Defendant Edcomm and SISCOM brought suit against Dr. Eagle in the

United States District Court for the Southern District of New York. (Compl., Sawabeh Info. Servs.

Co. & Edcomm, Inc. v. Clifford Brody, Linda Eagle, and David Shapp, No. Civ.A.11-4164

(S.D.N.Y. June 17, 2011).)  This action alleged claims of securities fraud, fraudulent inducement,

common law fraud, breach of contract, breach of the covenant of good faith and fair dealing, and

other common law claims and demands for injunctions, declaratory relief, and indemnification.

(Id.)

On July 1, 2011, Plaintiff initiated the present litigation in this Court setting forth eleven

causes of action, as follows: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18

U.S.C. § 1030(a)(2)(C); (2) violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C); (3) violation of

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) unauthorized use of name in

violation of 42 Pa.C.S. § 8316; (5) invasion of privacy by misappropriation of identity; (6)

misappropriation of publicity; (7) identity theft under 42 Pa.C.S. § 8315; (8) conversion; (9) tortious

interference with contract; (10) civil conspiracy; and (11) civil aiding and abetting.  (Id. ¶ 61-141.)

Thereafter, on August 1, 2011, Defendants filed their Answer and Defendant Edcomm filed

a Counterclaim Complaint.  The Counterclaim Complaint alleged that Edcomm, while under Dr.

Eagle's management, implemented a policy requiring Edcomm's employees to create and maintain

LinkedIn accounts.  (Countercl. ¶ 1.)  These employees were required to: (a) utilize their Edcomm

email address for LinkedIn accounts; (b) utilize a specific form template, created and approved by

Edcomm, for their description of Edcomm, work history, and professional activities, as well as

4

photographs taken by a professional photographer hired by Edcomm; (c) contain links to Edcomm's website on LinkedIn accounts and the Banker's Academy webpage, as well as Edcomm's telephone number; and (d) utilize Edcomm's template for replying to individuals through LinkedIn.  (Id. ¶ 2.) Certain Edcomm employees monitored these LinkedIn accounts, corrected any violations of Edcomm policy, and maintained accounts for several employees for the benefit of Edcomm.  (Id. ¶ 3.)  In fact, all discussions, connections, and content were added by Ms. Arnsperger or Ms. Sweeney at the direction of, or on behalf of Edcomm.  (Id. ¶ 10.)  According to the Counterclaim, for all departing employees, Edcomm, at the direction of management, requested and retrieved Edcomm-related LinkedIn connections and content from the departing employees' accounts.  (Id. ¶ 4.)

Dr. Eagle's LinkedIn account was used for Edcomm business and Edcomm personnel developed and maintained all connections and much of the content on her account.  (Id. ¶¶ 5-6.) Defendants now contend that Plaintiff has wrongfully misappropriated both Edcomm's connections on the LinkedIn account and Edcomm's telephone number.  (Id. ¶ 7.)  Indeed, approximately three weeks after initiating the present action, Plaintiff regained control of the LinkedIn account, but has refused to return to Edcomm its proprietary information on the account  (Id. ¶¶ 8-9.)

In addition, during the times relevant to this case, Edcomm held an account with AT&T through which it purchased cellular telephones, maintained accounts, and paid usage bills for those employees who had sales responsibilities.  (Id. ¶ 11.)  The cellular telephone numbers were on Edcomm's account and were Edcomm's property.  (Id. ¶ 12.)  When any employee who had such a phone left Edcomm, the company either disabled the related number or transferred it to another employee.  (Id. ¶ 13.)  Upon Dr. Eagle's termination, Edcomm followed the same protocol and disabled her number.  (Id. ¶¶ 14, 16.)  Because Dr. Eagle made plain her intent to compete with

5

Edcomm and because her cellular number appeared on numerous Edcomm materials, it was particularly important for her number to be disabled.  (Id. ¶ 17.)  Defendants allege, however, that Dr. Eagle misrepresented her affiliation with Edcomm and misused Edcomm's EIN number to transfer the number to another cellular phone with an account at AT&T.  (Id. ¶ 20.)

Finally, the Counterclaim asserts that during her tenure at Edcomm, Dr. Eagle had a laptop personal computer issued by Edcomm.  (Id. ¶ 23.)  At the time of her termination, Dr. Eagle refused to return the Edcomm-issued laptop.  (Id. ¶ 24.)  Just prior to her departure, Dr. Eagle took the laptop from the premises and, despite repeated requests from Edcomm, she has failed to return it.  (Id. ¶¶ 25-26.)

In connection with these additional allegations, Defendant Edcomm raised the following counterclaims: (1) violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C); (2) violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C); (3) misappropriation; (4) unfair competition; (5) conversion; (6) tortious interference with contract; (7) violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301, et seq., and (8) tortious interference with prospective relations.  (Id. ¶¶ 27-71.)  On September 21, 2011, Plaintiff filed a Motion for Judgment on the Pleadings as to Defendant Edcomm's Counterclaims, and Defendant responded on October 19, 2011.  Plaintiff then filed a Reply Brief on October 28, 2011, making this Motion ripe for judicial review.

## II.     STANDARD OF REVIEW

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  While motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) must be brought before, and in lieu of, filing answers, a Rule 12(c) motion is appropriate

after the defendants have answered the complaint.  Id.  The difference between Rules 12(b)(6) and

12(c), however, is purely procedural and there is "no material difference in the applicable legal

standards."  Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004).  Accordingly, the Court turns to

Rule 12(b)(6) jurisprudence for further guidance on the appropriate standard of review.

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not

stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United

States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the

United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  Id. at 555.  Following these basic dictates, the Supreme

Court, in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), subsequently defined a two-

pronged approach to a court's review of a motion to dismiss.  "First, the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice."  Id., 129 S. Ct. at 1949.  Thus, although "Rule 8 marks a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions."  Id.  at 1950.  Second,

the Supreme Court emphasized that "only a complaint that states a plausible claim for relief

survives a motion to dismiss."  Id.  "Determining whether a complaint states a plausible claim for

relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense."  Id.  A complaint alleges, but does not

show, an entitlement to relief when the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct.  Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232-34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static.  Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations.  Phillips, 515 F.3d at 233.  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DISCUSSION

The present motion seeks dismissal of the entirety of Defendant Edcomm's Counterclaim Complaint.  The Court addresses each cause of action individually.

### A.    **Computer Fraud and Abuse Act Claims (Counts I and II)**

Counts I and II of the Counterclaim Complaint allege that Plaintiff violated the CFAA by accessing, without authorization, Edcomm's AT&T account, which is a "data storage facility" under the Act and which is hosted on AT&T's computer.  Plaintiff argues that this claim is simply not viable.

The CFAA, although initially a criminal statute that penalized computer hacking activities, presently authorizes private civil actions in certain situations.  P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 510 (3d Cir. 2005) (citing 18 U.S.C. § 1030(g)). The CFAA proscribes seven actions that will result in civil and criminal liability. 18 U.S.C. § 1030(a)(1)-(7); Fontana v. Corry, No. Civ.A.10-1685, 2011 WL 4473285, at *4 (W.D. Pa. Aug. 30, 2011).  Defendant Edcomm premises its allegations on sections 1030(a)(2)(C) and 1030(a)(5)(C) of the CFAA, which state:

> (a) Whoever–
> . . .
>> (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains–
>
> . . .
>>> (C) information from any protected computer;
>
> . . . [or] . . .
>> (5)(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.
>
> shall be punished as provided in subsection (c) of this section.

18 U.S.C.A. §§ 1030(a)(2)(C) & (a)(5)(C).  A party bringing such a claim must also meet the requirements of § 1030(g), which states in relevant part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A) (I).  Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

18 U.S.C. § 1030(g).  "In other words, a violation of the offenses described in subsection (a) gives

rise to civil liability under subsection (g) only if the alleged conduct violates one of the factors set

forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(I) . . . ."  Fontana, 2011 WL

4473285, at *4 (quoting Consulting Prof'l Res., Inc. v. Concise Techs. LLC, No. Civ.A.09-1201,

2010 WL 1337723, at *3 (W.D. Pa. Mar. 9, 2010).

Plaintiff avers that Edcomm's CFAA claims fail because of the absence of factual

allegations that: (1) Dr. Eagle accessed a protected computer without authorization or (2) Edcomm

suffered cognizable damages as required under the CFAA.  The Court takes each argument

separately.

### 1.  Whether Edcomm Has Alleged Computer Access "Without Authorization"

Plaintiff first contends that the counterclaims do not allege facts which establish Plaintiff's

unauthorized access to a protected computer.  Rather, the two CFAA claims allege only that,

"[t]hrough Dr. Eagle's misrepresentation of her affiliation with Edcomm or use of its information

without authorization, Dr. Eagle gained access to Edcomm's AT&T account and misappropriated

Edcomm's Number."  (Countercl. ¶¶ 32, 39.)  Such actions, according to Plaintiff, fail to provide a

basis for relief under the CFAA.

The two CFAA provisions at issue in this case apply only if Plaintiff "intentionally

accesse[d]" information on a protected computer.  18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(C).

Although the Third Circuit has not addressed the meaning of the word "access" within the CFAA,

courts in other circuits have used the word's common definition.  See Southwest Airlines Co. v.

BoardFirst, L.L.C., No. Civ.A.06-891, 2007 WL 4823761, *12 (N.D. Tex. Sept. 12, 2007) (utilizing

the "dictionary definition . . . mean[ing] 'to get at' or 'gain access to'" in determining "access"

pursuant to the CFAA); <u>Am. Online, Inc. v. Nat'l Health Care Disc., Inc.</u>, 121 F. Supp. 2d 1255,

1272 (N.D. Iowa 2000) ("As a noun, 'access,' in this context, means to exercise the freedom or

ability to make use of something. . . .  For purposes of the CFAA, when someone sends an e-mail

message from his or her own computer, and the message then is transmitted through a number of

other computers until it reaches its destination, the sender is making use of all of those computers,

and is therefore 'accessing' them.").  A review of the CFAA's purpose reveals that the word

"access" in the context of the statute was meant to require actual handling of a computer.  "At its

core, the Act is intended to protect the 'confidentiality, integrity, and security of computer data and

networks' by *prohibiting misuse of a computer* and providing civil and criminal sanctions for

knowing or intentional violations."  Nicholas R. Johnson, "'I Agree to Criminal Liability': Lori

Drew's Prosecution Under § 1030(A)(2)(c) of the Computer Fraud & Abuse Act, and Why Every

Internet User Should Care," 2009 <u>U. Ill. J.L. Tech. & Pol'y</u> 561, 567 (Fall 2009) (emphasis added).

     Further, both of the CFAA provisions require that the access be "unauthorized."  The CFAA

does not define the term "authorization," thereby resulting in two schools of thought on the meaning

of the term.  "The Courts of Appeals in the First and Seventh Circuits, and a number of district

courts have concluded that if an employee, although technically authorized to utilize an employers's

protected computer, accesses confidential or proprietary information and uses that information in a

manner inconsistent with the employer's interests or in a manner that violates a contractual

obligation, that employee has exceeded his or her authorized use."  <u>Consulting Prof'l Res.</u>, 2010

WL 1337723, at *4-5 (citing <u>EF Cultural Travel BV v. Explorica, Inc.</u>, 274 F.3d 577 (1st Cir.

2007)); <u>Int'l Airport Ctrs., LLC v. Citrin</u>, 440 F.3d 418 (7th Cir. 2006); <u>Shurgard Storage Ctrs., Inc.</u>

v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121 (W.D. Wash. 2000).  Using this logic, these

courts have reasoned that the agency relationship, and therefore the rights of access, terminates

when the employee "acquires adverse interests . . . to the principal." Int'l Airport Ctrs, 440 F.3d at

421.  "Other courts, however, have rejected reliance on agency law in analyzing the authorization

provisions in the CFAA and instead conclude that the statute was enacted to penalize the

unauthorized procurement or alteration of information rather than its misuse." Consulting Prof'l

Res., 2010 WL 1337723, at *5 (citing LVRC Holdings LLC v. Brekka, 581 F.3d 1127 (9th Cir.

2009)); Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda, 390 F. Supp. 2d 479,

498 (D. Md. 2005) ("to the extent [defendant] may have breached the Registration Agreement by

*using* the information obtained for purposes contrary to the policies established by . . . [the plaintiff],

it does not follow, as a matter of law, that she was not authorized to access the information, or that

she did so in excess of her authorization in violation of the SECA or the CFAA."); Condux Int'l,

Inc. v. Haugum, No. Civ.A.08-4824, 2008 WL 5244818, at * 5 (D. Minn. Dec. 15, 2008) (noting

that if Congress intended to target person's use of information, it would have provided language to

that effect); Shamrock Foods Co. v. Gast, 535 F. Supp. 2d 962, 965 (D. Ariz. 2008) (finding that

legislative history of CFAA supports a narrow reading)).

Though the Third Circuit has yet to address the meaning of "exceeds authorized access,"

courts in this district have adopted the latter view and have held that, in the employer-employee

context, "an employee who may access a computer by the terms of his employment is 'authorized'

to use that computer for purposes of [the] CFAA even if his purpose in doing so is to misuse or

misappropriate the employer's information." Bro-Tech Corp. v Thermax, Inc., 651 F. Supp. 2d 378,

407 (E.D. Pa. 2009); see also Grant Mfg. & Alloying, Inc. v. McIllvain, No. Civ.A.10-1029, 2011

WL 4467767, at *6 (E.D. Pa. Sept. 23, 2011); Integrated Waste Solutions, Inc. v. Goverdhanam,

No. Civ.A.10-2155, 2010 WL 4910176, at *8 (E.D. Pa. Nov. 30, 2010); Consulting Prof'l Res.,

2010 WL 133723, at *6.[1]  Given the great weight of authority in this Circuit, this Court similarly

adopts this definition.

The Counterclaim Complaint, in this case, alleges that, Dr. Eagle, without authorization,

accessed Edcomm's AT&T account, which is hosted on AT&T's computer.  (Countercl. ¶ 31.)

"Through [her] misrepresentation of her affiliation with Edcomm or use of its information without

authorization, Dr. Eagle gained access to Edcomm's AT&T account on AT&T's protected

computer, obtained information therefrom and misappropriated Edcomm's number."  (Id. ¶ 32.)

Nothing in this claim avers any specific, factual conduct that would constitute a violation of the

CFAA.  Primarily, there is no allegation that Dr. Eagle ever "accessed" a computer.[2]  Rather, the

counterclaim only alleges that through a "misrepresentation of her affiliation with Edcomm," Dr.

---

[1]  Defendant Edcomm attempts to distinguish these cases on the grounds that they involve Section (a)(4) of the CFAA, not Sections (a)(2)(C) or (a)(5).  All of these sections, however, require accessing a computer "without authorization."  It is a well-established principle of statutory construction that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears."  Ratzlaf v. U.S., 510 U.S. 135, 143 (1994).  As the aforementioned cases are simply cited to define the term "without authorization" as used in 18 U.S.C. § 1030, they are pertinent to the discussion here.

[2]  The CFAA defines a computer as

An electronic, magnetic, optical, electrochemical, or other high speed data processing device that performs logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

18 U.S.C. § 1030(e)(1).

Eagle "gained access to Edcomm's AT&T account."  (Id. ¶ 32.)  In simpler terms, the claim asserts

that Dr. Eagle entered an AT&T store, falsely stated that she was still affiliated with Edcomm, and

had AT&T employees transfer the phone number from her previous Edcomm phone to another

cellular phone with an account at AT&T.  (Id. ¶ 20.)  At no point in this series of events did she ever

gain any access to any computer, be it Edcomm's or AT&T's.  Moreover, the Counterclaim

Complaint fails to establish a factual basis for finding that her access to the AT&T accounts was

"without authorization."  Although Dr. Eagle may have misstated that she was still employed at

Edcomm, the fact remains that AT&T employees authorized her access to the Edcomm account

information stored on AT&T's computers and transferred the cellular number from the Edcomm

phone to her own new phone.  The allegation that she used the information in an improper way or

otherwise caused damage or loss does not make her "access" improper.  At most, the allegations set

forth in support of the CFAA claim establish nothing more than a state law cause of action for

misappropriation.  Accordingly, the Court finds that the first element under the CFAA has not been

satisfied.

### 2.     Whether Edcomm Has Properly Pled Damages Under the CFAA

In addition, Plaintiff argues that Defendant has not alleged cognizable damages to support

the CFAA claims.  Section 1030(g) requires that any person bringing a claim under the CFAA must

have sustained "damage or loss" as a result of the violation.  18 U.S.C. § 1030(g).  The statute

defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or

information."  18 U.S.C. § 1030(e)(8).  The statute goes on to define "loss" as "any reasonable cost

to any victim, including the cost of responding to an offense, conducting a damage assessment, and

restoring the data, program, system, or information to its condition prior to the offense, and any

revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).  "Courts have held that to fall within this definition, the alleged 'loss' must be related to the impairment or damage to a computer or computer system." Fontana, 2011 WL 4473285, at *7; see also Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio, No. Civ.A.08-2751, 2010 WL 4224473, at *6 (E.D. Pa. Oct. 22, 2010) ("Various courts have interpreted 'loss' to mean the remedial costs of investigating a computer for damage, remedying damage done, and costs incurred while the computer is inoperable.") (citations omitted).  Likewise, courts have found that lost revenue incurred because of an interruption of service falls within the definition of "loss." Fontana, 2011 WL 4473285, at *7.  Claims of lost business opportunities, damaged reputation, loss of assets, and other missed revenue, however, do not constitute "loss." See, e.g., id. at *8 (finding that a claim for future lost revenue due to the dissemination of trade secrets was not a "loss" under the CFAA); Crown Coal & Coke Co. v. Compass Point Res., LLC, No. Civ.A.07–1208, 2009 WL 1806659, at *8 (W.D. Pa. June 23, 2009) (holding that alleged loss of business opportunities not compensable under the CFAA); Advantage Ambulance Grp. v. Lugo, No. Civ.A.08-330, 2009 WL 839085, at *4 (E.D. Pa. Mar. 30, 2009) (finding that allegation of a "loss of revenue" is not the type of loss encompassed by the CFAA); Clinton Plumbing, 2010 WL 4224473, at *6 (holding claim that integrity of bank funds was impaired as opposed to claim that the integrity of data was impaired did not allege damage or loss for purpose of CFAA).

Defendant Edcomm's Counterclaim Complaint contends that, as a result of Dr. Eagle's violations of the CFAA, it has "suffered and/or will suffer actual and/or consequential damages including loss of business relations and is entitled to damages, as well as attorneys' fees, in an amount to be determined at trial."  (Countercl. ¶¶ 33, 40.)  It further notes that "[b]ecause of the

appearance of Edcomm's Number o[n] its marketing and other client materials, Dr. Eagle's theft of this number will cause grave harm to its business."  (Id. ¶ 21.)  In its Response to the Motion for Judgment on the Pleadings, Edcomm clarifies that it has also had to bear the costs associated with replacing the advertising that had the Number as a feature.[3]  (Def. Edcomm's Resp. Mot. Judg. Pleadings 7.)  These are precisely the type of damages that courts repeatedly have deemed beyond the purview of the CFAA.  Nothing in these allegations avers any loss related to the impairment or damage to a computer or computer system, any remedial costs of investigating or repairing computer damage, or costs incurred while the computers were inoperable.

### 3.     Conclusion as to CFAA Claims

In light of the foregoing, the Court must grant Plaintiff's Motion as to both counterclaims under the CFAA.  Defendant Edcomm has failed to set forth any plausible claim that Plaintiff Dr. Eagle accessed a protected computer without authorization.  Moreover, Edcomm has not alleged any cognizable damages under the Act.  Accordingly, Counts I and II of the Counterclaim Complaint are dismissed.

### B.     Pennsylvania Uniform Trade Secrets Act (Count VII)

Count VII of Defendant Edcomm's Counterclaim Complaint sets forth a violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S. § 5301, et seq.  Specifically, Edcomm asserts that, "by virtue of her employment with Edcomm, Dr. Eagle gained access to

---

[3]  Edcomm also asserts in its Response that it has "alleged that its injuries stem directly from the access to protected computers without authorization, since that access caused an alteration of the integrity of AT&T's data and the loss of the Number to Eagle."  (Def. Edcomm's Resp. Mot. Judg. Pleadings 7.)  Such an allegation, however, appears nowhere in the Counterclaim Complaint.

Edcomm's trade secrets and confidential information, including Edcomm's AT&T account information, customer contacts and instructor identities and contacts." (Countercl. ¶ 62.) It goes on to contend that Dr. Eagle willfully and maliciously misappropriated AT&T account information to take Edcomm's telephone number, which will allow her to utilize Edcomm's secrets to and for her own benefit. (Id. ¶¶ 63-65.) Plaintiff responds that none of the information alleged in this claim actually constitutes a trade secret.

"To state a claim for misappropriation under the PUTSA, the plaintiff need only allege that the defendant used or disclosed information that it knew or had reason to know was a trade secret and that the defendant had acquired such information by accident or mistake." Ideal Aerosmith, Inc. v. Acutronic USA, Inc., No. Civ.A.07-1029, 2007 WL 4394447, at *8 (E.D. Pa. Dec. 13, 2007). A party may also misappropriate a trade secret when he "acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 110 (3d Cir. 2010) (citation omitted).

"The threshold inquiry in a trade secret misappropriation claim under Pennsylvania law is whether the information at issue is a trade secret." Fishkin v. Susquehanna Partners, G.P., 563 F. Supp. 2d 547, 581 (E.D. Pa. 2008) (citing Van Prods. Co. v. Gen. Welding & Fabricating Co., 213 A.2d 769, 780 (Pa. 1965)), aff'd 340 Fed. Appx. 110 (3d Cir. 2009). The PUTSA defines a "trade secret" as

Information, including a  formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1)   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who

17

can obtain economic value from its disclosure or use.

    (2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 PA. CONS. STAT. § 5302.  Trade secrets need not be "technical in nature" to be fully protected by Pennsylvania law.  Bimbo Bakeries, 613 F.3d at 112.  Rather, to be a trade secret, "information must not be generally known in the wider business community or capable of being easily derived from public information.  Trade secrets 'must be particular secrets of the complaining employer and not general secrets of the trade in which he is engaged.'"  Fishkin, 563 F. Supp. 2d at 582 (quoting Capital Bakers v. Townsend, 231 A.2d 292, 294 (Pa. 1967)).  To determine whether particular information is a trade secret, courts applying Pennsylvania law have looked to several factors set out in the Restatement:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

SI Handling Sys. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985) (citing Restatement (First) Torts § 757, cmt. b).  "Courts have found 'trade secrets' to include 'certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated.'"  Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 2d 612, 621 (E.D. Pa. 2009) (quoting BIEC Int'l, Inc. v. Global Steel Servs., Ltd., 791 F. Supp. 489, 545 (E.D. Pa. 1992)).

Plaintiff contends that because Edcomm's website discloses the identity of more than 1,000 clients, Edcomm's "customer information" cannot constitute a trade secret. (Pl.'s Mot. Judg. Pleadings 10.) In addition, she argues that the identity of Edcomm's instructors is publicly available on their LinkedIn profiles. (Id.) Finally, Plaintiff asserts that there is no independent economic value to Edcomm arising from Edcomm's AT&T account information, since Edcomm is in the business of training bankers, not selling telecommunications services. (Id.)

Defendant, on the other hand, concedes that the names of customers listed on its website are not trade secrets and emphasizes that its current trade secret claim is not based on instructor contact information.[4] Rather, it asserts that Dr. Eagle, by virtue of her longstanding position as President of the company, gained access to "Edcomm's trade secrets," including Edcomm's AT&T account information and the manner and means for accessing that account – information that was both protected and not publicly available. (Def. Edcomm's Resp. Mot. Judg. Pleadings 8-9.)

Given Defendant's limitation of its claim, the Court focuses solely on whether Edcomm's AT&T account information, including Edcomm's EIN number, constitutes a trade secret. As a general rule, the issue of whether certain information rises to the level of a trade secret requires discovery. Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc., No. Civ. A.11-4568, 2011 WL 6046923, at *5 (E.D. Pa. Dec. 6, 2011). Nevertheless, Defendant has offered no explanation as to how any such discovery could establish that an employer EIN number or information in a company telephone account could possible achieve "trade secret" status. While such account information may not be widely known, Defendant does not indicate how this

---

[4] Edcomm maintains that the instructor contact information is, in fact, trade secret information, but as it is the basis of the companion action currently pending in the Southern District of New York, it is not bringing that claim here.

information "[d]erives independent economic value, actual or potential, from not being generally known to, and not be readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." 12 PA. CONS. STAT. § 5302.  Simply put, "this is not information that will be routinely used in Plaintiff's business [as a financial service and training company], nor does it give the Plaintiff an everyday advantage over Plaintiff's competitors." Emtec, Inc. v. Condor Tech. Solutions, Inc., No. Civ.A.97-6652, 1998 WL 834097, at *8 (E.D. Pa. Nov. 30, 1998).

Defendant's current effort to establish the requisite independent economic value of this information is misplaced.  Edcomm contends that Plaintiff "has used what is equivalent to a trade secret password to derive an economic benefit —  the harnessing of the power of the Number that has been used to generate business for Edcomm."  (Def.'s Resp. Mot. Judg. Pleadings 9.)  In so arguing, however, Defendant effectively concedes that it is not the account information or EIN number/password that has any economic value, but rather the telephone number in and of itself. Having already alleged that the cellular number at issue appears on numerous Edcomm materials, (Countercl. ¶ 17), Defendant is now hard-pressed to argue that it was the subject of efforts that were "reasonable under the circumstances to maintain its secrecy."

In short, Defendant has not identified any information that meets both elements of the definition of "trade secret" under Pennsylvania law: (1) having independent economic value to others and (2) being the subject of reasonable efforts to maintain its secrecy.  Absent the identification of a potentially cognizable "trade secret," Defendant's claim under the PUFTA must fail.

## C.    Conversion (Count V)

The Counterclaim Complaint next alleges that "[p]ursuant to policies developed with the knowledge and consent of Dr. Eagle, Edcomm was the rightful owner of Edcomm's Number, LinkedIn Account connections, and Laptop."  (Countercl. ¶ 52.)  "Notwithstanding her knowledge of Edcomm's policies and investment therein and the true ownership, Dr. Eagle intentionally and through wrongful means converted Edcomm's Number, LinkedIn Account connections, and Laptop."  (Id. ¶ 53.)  By way of its Response to the Motion for Judgment on the Pleadings, however, Defendant has foregone any claim that the number and LinkedIn account were improperly converted, and now limits its conversion claim solely to the laptop.[5]

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."  Leonard A. Feinberg, Inc. v. Cent. Asia Capital Corp., 974 F. Supp. 822, 844-45 (E.D. Pa. 1997) (citation omitted).  Plaintiff argues that Edcomm has failed to adequately plead ownership or a right to possess the laptop.  The Court, however, disagrees.  The Counterclaim Complaint specifically alleges that, "[d]uring her tenure at Edcomm, Dr. Eagle had a laptop personal computer issued by Edcomm" and that, despite repeated requests, Dr. Eagle refused to return it upon termination.  (Id. ¶¶ 23-24.)  Subsequently, the Counterclaim Complaint alleges that "[p]ursuant to policies developed

---

[5] "Pennsylvania courts continue to hold that only tangible property, or intangible property rights which have merged with, or are otherwise connected to, a document, are subject to conversion."  DirecTV v. Frick, No. Civ.A.03-6045, 2004 WL 438663, at *2 (E.D. Pa. Mar. 2, 2004) (citing Northcraft v. Edward C. Michener Assoc., 466 A.2d 620, 625 (Pa. Super. Ct. 1983)); see also Apparel Bus. Sys., LLC v. Tom James Co., No. Civ.A.06-1092, 2008 WL 858754, at *18 (E.D. Pa. Mar. 28, 2008) ("Courts in the Eastern District of Pennsylvania have found that domain names and satellite signals are not subject to conversion because they are not types of intangible property that merge with particular documents.").  Defendant concedes these principles and states that, as a result, it "will not pursue conversion claims" with respect to the cell phone number and LinkedIn account.  (Def. Edcomm's Mot. Judg. Pleadings 10.)

with the knowledge and consent of Dr. Eagle, Edcomm was the rightful owner of . . . [the] Laptop." (Id. ¶ 52.)  Taking these allegations as true, as the Court must at this stage of the litigation, Edcomm has properly alleged ownership in the laptop computer taken by Dr. Eagle.  As such, the Court declines to dismiss this claim.

> ### D.      Misappropriation (Count III)

The next cause of action in Defendant Edcomm's Counterclaim Complaint sets forth a claim of misappropriation.  Specifically, Edcomm argues that it was the rightful owner of Edcomm's number and the LinkedIn account connections.  (Id. ¶ 42.)  Edcomm prepared and distribution marketing materials containing its number, and Edcomm's personnel developed, maintained, and furthered the LinkedIn Account for Edcomm's sole benefit and use.  (Id. ¶¶ 43-44.)  Although Dr. Eagle knew of Edcomm's proprietary interest in these items, she nonetheless misappropriated both Edcomm's telephone number and her LinkedIn account connections for her own use.  (Id. ¶ 45.)

The elements of a misappropriation of trade secrets claim in Pennsylvania are:  "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff."  Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2003).  "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if . . . his disclosure or use constitutes a breach of confidence."  Id. at 566 n.3 (quoting Restatement (First) of Torts at 774 n.4).

The tort of misappropriation of an idea, however, has only two elements: (1) the plaintiff had an idea that was novel and concrete and (2) the idea was misappropriated by the defendant. Blackmon v. Iverson, 324 F. Supp. 2d 602, 607 (E.D. Pa. 2003).  To determine whether an idea has

been misappropriated, Pennsylvania courts look to the three elements of common law

misappropriation:

> (1) the plaintiff "has made substantial investment of time, effort, and money into
> creating the thing misappropriated such that the court can characterize the 'thing' as a
> kind of property right," (2) the defendant "has appropriated the 'thing' at little or no
> cost such that the court can characterize the defendant's actions as 'reaping where it
> has not sown,' " and (3) the defendant "has injured the plaintiff by the
> misappropriation."

Riordan v. H.J. Heinz Co., No. Civ.A.08-1122, 2009 WL 4782155, at *8 (W.D. Pa. Dec. 8, 2009)

(quoting Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., 35 A.2d 712, 716 (Pa. Super. Ct. 1999)).

In the present case, to the extent Defendant alleges misappropriation of a trade secret, its

claim must necessarily fail.[6]  As set forth above, neither the telephone number nor the LinkedIn

account connections qualify as trade secrets, as both are either generally known in the wider

business community or capable of being easily derived from public information.

Defendant's allegation of misappropriation of an idea, however, gives the Court somewhat

more pause.  The Counterclaim Complaint expressly alleges that, with respect to the LinkedIn

account connections and content, "Edcomm personnel, not Dr. Eagle, developed and maintained all

connections and much of the content on the LinkedIn Account, actions that were taken solely at

Edcomm's expense and exclusively for its own benefit."  (Id. ¶ 6.)  While Plaintiff argues that

Edcomm fails to allege facts that would show that it made a substantial investment of time, effort,

and money into creating the cell phone number or LinkedIn account, Edcomm counters that its

employees developed the accounts and maintained the connections, which are the route through

---

[6]  In footnote 11 of Defendant's Response Brief, Edcomm states that "it never asserts
trade secret misappropriation."  (Def. Edcomm's Resp. Mot. Judg. Pleadings 10 n.11.)  Because
that fact is not entirely apparent from the face of the Counterclaim Complaint, however, the
Court addresses the merits of a possible trade secret misappropriation claim.

which Edcomm contacts instructors and specific personnel within its clients.  As these conflicting

allegations create an issue of fact requiring further discovery, the Court must deny the Motion for

Judgment on the Pleadings as to the misappropriation counterclaim.

### E.    Tortious Interference With Contract (Count VI)

Defendant Edcomm's tortious interference with contract claim asserts that it was a party to a

contract with AT&T for the provision of cellular telephone service, which included all telephone

numbers on its account as well as the cellular number at issue.  (Countercl. ¶ 56.)  Dr. Eagle was

purportedly aware of the contract between AT&T and Edcomm, yet, without justification or excuse,

tortiously interfered with that contract by improperly using Edcomm's AT&T account information

to transfer Edcomm's telephone number to another account.  (Id. ¶ 57.)  Edcomm now argues that as

a result of her actions, Dr. Eagle "wantonly and maliciously" deprived Edcomm of the benefits of its

agreement with AT&T, including the extensive use of Edcomm's number.

The elements of a claim for tortious interference derive from the Restatement (Second) of

Torts § 766, which has been adopted by Pennsylvania courts and federal courts applying

Pennsylvania law.  See Prudential Ins. Co. of Am. v. Stella, 994 F. Supp. 318, 322 n.1 (E.D. Pa.

1998); Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 97 n.2 (Pa. Super. Ct.

2009) (citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175 (Pa. 1978)), aff'd

20 A.3d 468 (Pa. 2011).  This section states:

> One who intentionally and improperly interferes with the performance of a contract
> (except a contract to marry) between another and a third person by inducing or otherwise
> causing the third party not to perform the contract, is subject to liability to the other for
> the pecuniary loss resulting to the other from the failure of the third person to perform
> the contract.

Restatement (Second) Torts § 766.  Give these dictates, a plaintiff alleging tortious interference

under Pennsylvania law must plead the following elements: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 384 (3d Cir. 2004) (quotations omitted).

Two elements stand at the core of the present Motion for Judgment on the Pleadings. The second element requires a plaintiff to plead a "purposeful action on the part of the defendant, specifically intended to harm the existing relation." Notably, "[i]t is not sufficient . . . to show that the defendant intentionally breached its contract. A plaintiff must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing or prospective business relationships." Valley Forge Convention & Vistors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998). Interference is intentional when "'the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" Brown & Brown, Inc. v. Cola, No. Civ.A.10-3898, 2010 WL 5258067, at *6 (E.D. Pa. Dec. 22, 2010) (quotations omitted). "[O]ne interferes with a contract only where he causes a party not to perform under it." Ruder v. Pequea Valley Sch. Dist., 790 F. Supp. 2d 377, 396 (E.D. Pa. 2011) (quotations omitted). "Merely describing something as malicious is not sufficient to give the proper inference of malice, meaning an intent to injure." Ferki v. Wells Fargo Bank, Nat'l Ass'n, No. Civ.A.10-2756, 2010 WL 5174406, at *8 (E.D. Pa. Dec. 20, 2010) (quotations omitted).

The fourth element mandates that a plaintiff properly plead actual legal damage as a result of

the defendant's conduct.  <u>Strickland v. Univ. of Scranton</u>, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)

(citations omitted).  Actual legal damage is "pecuniary loss flowing from the alleged interference

with contract" and does not include recovery solely for harm to business reputation.  <u>Shiner v.</u>

<u>Moriarty</u>, 706 A.2d 1228, 1239 (Pa. Super. Ct. 1998).  In other words, "[l]iability under section 766

extends to damages for the pecuniary loss of the contract interfered with, consequential losses for

which the interference is the legal cause, and emotional and reputational damages if they are

reasonably to be expected to result from the interference."  <u>Total Care Sys., Inc. v. Coons</u>, 860 F.

Supp. 236, 242 (E.D. Pa. 1994).

Defendant Edcomm's claim fails to properly plead either of these two elements.  First, it

puts forth no factual allegations to support any inference that Plaintiff acted for the purpose of

interfering with Edcomm's existing contract with AT&T.  Indeed, aside from providing its

threadbare recital of the elements — <i>i.e.</i>, that "Dr. Eagle wantonly and maliciously deprived

Edcomm of the benefits of its agreement with AT&T" — the Counterclaim Complaint does not

explain how Plaintiff's transferring of her work cell phone number to her own cellular phone

account establishes either an intent to interfere in a contract or knowledge that harm will result.

Absent some factual allegations which raise the right to relief above the speculative level, the claim

for tortious interference cannot survive.[7]

---

[7] Notably, Defendant's Response to the Motion for Judgment on the Pleadings does little
to explain how its allegations are sufficient.  After setting forth the four elements of a tortious
interference claim, Defendant argues:

Yet contrary to Eagle's motion, Edcomm meets the standards.  Edcomm pleaded the
existence of a contract with AT&T (¶ 56), Eagle's awareness of the contract (¶ 57),
her unjustified interference with that contract (¶¶ 19-22, 58) and damages resulting
from that interference (¶ 60).

The facts pleaded make clear that Eagle improperly misappropriated the AT&T

In addition, Defendant has not alleged any actual legal damage as a result of Plaintiff's conduct.  Although Defendant must establish some pecuniary loss flowing from the alleged interference, it avers only that "[a] a direct and proximate result of Dr. Eagle's tortious [conduct] described above, Edcomm has suffered and/or will suffer actual and/or consequential damages including loss of good will and business relations and is entitled to damages in an amount to be determined at trial."  (Countercl. Compl. ¶ 60.)  At no point does Defendant suggest that its contract with AT&T was affected in any manner by Plaintiff's actions.  Nor does Defendant show how the telephone number was "intrinsically tied" to Edcomm's account with AT&T.  While Plaintiff may have unjustly benefitted from maintaining a cellular number to which Edcomm's marketing materials direct its clients, that benefit has nothing to do with any interference in any AT&T contract.  Accordingly, the Court must dismiss this claim.

### F.      Tortious Interference with Prospective Relations (Count VIII)

The next Counterclaim at issue is Defendant Edcomm's tortious interference with prospective relations cause of action.  The Counterclaim Complaint simply alleges that Edcomm invested heavily in developing client relationships in the United States and internationally and, as such, had prospective relationships with these clients.  (Countercl. Compl. ¶ 68.)  Although Dr. Eagle was aware of these prospective relationships, she, without justification or excuse, "tortiously interfered [with] these prospective relationships by using without authorization Edcomm's information and/or misrepresented her affiliation with Edcomm to interfere with that contract to

---

number, that was intimately tied to Edcomm's marketing and advertising and that Edcomm is damaged thereby.  That is sufficient to state a claim and demand from Eagle the proofs to further build on the extent of damage she has caused.

(Def. Edcomm's Resp. Mot. Judg. Pleadings 12-13.)  This argument highlights precisely the type of sparse pleading that is no longer permitted under the dictates of Twombly and Iqbal.

transfer Edcomm's number to another account." (Id. ¶ 70.)

A claim of tortious interference with prospective contractual relations has the same elements as a claim of interference with existing contractual relations, except that it also requires a showing of the existence of prospective contracts. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1015 (3d Cir. 1994). "In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts have considered whether the evidence supports a finding that there was an objectively 'reasonable likelihood or probability' that the contemplated contract would have materialized absent the defendant's interference." Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 213 (3d Cir. 2009) (citations omitted). "A 'reasonable likelihood' of occurrence is something less than a contractual right but more than a mere hope that there will be a future contract." Id. (citing Phillips v. Selig, 959 A.2d 420, 428 (Pa. Super. Ct. 2008)). Furthermore, a plaintiff must base its claim that there was a prospective contractual relationship on something other than an existing or current relationship. Id.

Defendant Edcomm's Response to the pending Motion argues that

Eagle has interfered with the AT&T contract, thereby moving the Number to her exclusive use and control. Since that Number is tied to Edcomm's marketing materials, Eagle's use of the Number is tantamount to a passing off, representing that she is Edcomm and acquiring business that channels through the Number. . . . Eagle has effectively stood for Edcomm on all calls generated from the marketing and related advertising materials, to the detriment of Edcomm. That is sufficient to move forward on discovery with the extent of her interference.

(Def. Edcomm's Resp. Mot. Judg. Pleadings 13.) Nothing in this argument or the Counterclaim Complaint, however, identifies any individual or corporation with whom Edcomm had a reasonable likelihood of a contract, and which was disrupted by the actions of Plaintiff. Indeed, Defendant fails to point to one potential contract that would probably have materialized absent Plaintiff's

interference.  Edcomm's general allegation — that Plaintiff may have received calls from

prospective clients generated from the marketing and related advertising materials — constitutes

nothing more than a speculative belief.  The Court therefore dismisses this claim as well.

### G.     Unfair Competition (Count IV)

Defendant Edcomm's final counterclaim — unfair competition — asserts that, "[t]hrough

wrongful means, Dr. Eagle has taken Edcomm's Number and LinkedIn Account connections, both

of which will give her unauthorized access to Edcomm's clients and instructors."  (Countercl. ¶ 48.)

It further contends that, "Dr. Eagle knew at the time she wrongfully converted Edcomm's Number

and the LinkedIn Account connections that such information was proprietary to Edcomm."  (Id. ¶

49.)  Plaintiff now claims that such allegations cannot survive Rule 12(c) scrutiny.

Although Pennsylvania law traditionally defines unfair competition as the "passing off" of a

rival's goods as one's own, thus creating confusion between one's own goods and the rival's goods,

Scanvec Amiable Ltd. v. Chang, 80 Fed Appx. 171, 180 (3d Cir. 2003), the doctrine of unfair

competition in Pennsylvania has been extended to other types of conduct.  Granite State Ins. Co. v.

Aamco Transmissions, Inc., 57 F.3d 316, 319 (3d Cir. 1995) (citing Carl A. Colteryahn Dairy, Inc.

v. Schneider Dairy, 203 A.2d 469, 473 (Pa. 1964)).  "Pennsylvania courts have recognized a cause

of action for the common law tort of unfair competition where there is evidence of, among other

things, trademark, trade name, and patent rights infringement, misrepresentation, tortious

interference with contract, improper inducement of another's employees, and unlawful use of

confidential information."  Sythes (U.S.A.) v. Globus Med., Inc., No. Civ.A.04-1235, 2005 WL

2233441, at *8 (E.D. Pa. Sept. 14, 2005) (citations omitted).  The Pennsylvania common law tort of

unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair

Competition.  See Bldg. Materials Corp. of Am. v. Rotter, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa.

2008) (citations omitted); ID Sec. Sys. Of Canada, Inc. v. Checkpoint Sys., Inc., 249 F. Supp. 2d

622, 688 (E.D. Pa. 2003).  Section 1 of the Restatement[8] indicates that, "[a]s a general matter, if the

means of competition are otherwise tortious with respect to the injured party, they will also

ordinarily constitute an unfair method of competition."  Restatement (Third) of Unfair Competition

§ 1 cmt. g.  "Nevertheless, the term may not be construed 'as a virtual catch-all for any form of

wrongful business conduct' or to 'include all forms of modern business torts.'" Giordano v.

Claudio, 714 F. Supp. 2d 508, 521-22 (E.D. Pa. 2010) (quoting USX Corp. v. Adriatic Ins. Co., 99

F. Supp. 2d 593, 619 (W.D. Pa. 2000)).  "The Pennsylvania Supreme Court has noted that in

addition to the traditional scope of 'unfair competition' . . . the concept has been extended in some

business settings to include misappropriation as well as misrepresentation."  Hill v. Best Med. Int'l,

---

[8]  The Restatement (Third) of Unfair Competition provides, in relevant part, as follows:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:

   (1) deceptive marketing, as specified in Chapter Two;

   (2) infringement of trademarks and other indicia of identification, as specified in Chapter Three;

   (3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four;

or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public. . . .

Restatement (Third) of Unfair Competition § 1.

Inc., Nos. Civ.A.07-1709, 08-1404, 09-1194, 2011 WL 5082208, at *17 (W.D. Pa. Oct. 25, 2011)

(citing Pottstown Daily News Publ'g Co. v. Pottstown Broad. Co., 192 A.2d 657, 662 (Pa. 1963)).

Defendant's Counterclaim Complaint states only two cognizable claims for relief: (1)

conversion of the laptop computer and (2) misappropriation of the LinkedIn account.  The

conversion claim does not constitute the act of passing off one's goods as his or her own and does

not otherwise form the basis for any unfair competition.  The tort of misappropriation, however —

particularly one involving misappropriation of ideas — has been deemed to support an unfair

competition claim.  Given the early stages of these proceedings, the Court declines to dismiss this

claim.

## IV.    CONCLUSION AND LEAVE TO AMEND

Under the standards of Twombly and Iqbal, the Counterclaim Complaint, in its present form,

fails to state a claim upon which relief may be granted as to several of its counts.   In the last

sentence of its Response brief, however, Defendant Edcomm seeks leave to amend in the event any

of its claims are dismissed.

If a complaint is subject to Rule 12(b)(6) dismissal, a district court must ordinarily permit a

curative amendment unless such an amendment would be inequitable or futile.  Alston v. Parker,

363 F.3d 229, 235 (3d Cir. 2004).  Dismissal without leave to amend is justified only on grounds of

bad faith, undue delay, prejudice, and futility.  Id. at 236.  This opportunity to amend must be

offered, even if the plaintiff does not specifically make such a request.  Id. at 235.

Plaintiff provides no response to Defendant's request for leave to amend and, as such, sets

forth no bases on which this Court could find any of the above grounds for denial.  Accordingly, the

Court will grant the Motion for Judgment on the Pleadings as to Counts I, II, VI, VII, and VIII

without prejudice.  Defendant shall have a period of twenty days in which it may submit an Amended Complaint setting forth sufficient factual allegations to properly support the deficient counterclaims.  If an amendment is not forthcoming within that time or if Defendant expresses its desire to stand on its current Counterclaim Complaint, an order of dismissal on the deficient counts will be appropriate at that time.