IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA EAGLE, | : |
| | : CIVIL ACTION |
| Plaintiff, | : |
| | : |
| v. | : |
| | : NO. 11-4303 |
| SANDY MORGAN, HAITHAM SAEAD, | : |
| JOSEPH MELLACI, ELIZABETH | : |
| SWEENEY, LISA ARNSPERGER, | : |
| QAMAR ZAMAN, and EDCOMM, INC., | : |
| | : |
| Defendants. | : |

FILED
OCT – 4 2012
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

**MEMORANDUM**

BUCKWALTER, S. J.                                                                October 4, 2012

Currently pending before the Court is Motion by Defendant Edcomm, Inc. ("Edcomm") for Summary Judgment. For the following reasons, the Motion is granted in part and denied in part.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Edcomm is a banking education company incorporated in New York with it principal place of business in Fort Washington, Pennsylvania. (Compl. ¶ 2.) According to the Complaint, Plaintiff Linda Eagle holds a Ph.D. in communication and psychology and has extensive experience in the fields of financial services and training. (Compl. ¶ 11.) In 1987, Dr. Linda Eagle ("Dr. Eagle" or "Plaintiff") and a man named Clifford Brody founded Edcomm, Inc.

---

[1] This summary is limited to the facts most relevant to the present Motion for Summary Judgment.

("Edcomm") to provide such training services, and they were later joined as co-owners by David Shapp. (Compl. ¶ 12.) On October 7, 2010, a company named Sawabeh Information Services Company ("SISCOM") entered into a term sheet with Edcomm, Dr. Eagle, Mr. Brody, and Mr. Shapp, wherein SISCOM purchased all of the outstanding common shares of Edcomm. (Compl. ¶ 27.) Dr. Eagle, Mr. Brody, and Mr. Shapp originally remained employed as Edcomm executives, but, on June 20, 2011, they were involuntarily terminated by Defendant Haitham Saead. (Compl. ¶ 28.)

During 2008, while Dr. Eagle was president of Edcomm, she established an account on LinkedIn, which is a social networking website on the Internet for professional occupations. (Compl. ¶¶ 15–16; Def.'s Mot. Summ. J., Ex. 1 at Resp. to Interrog. No. 2.) Dr. Eagle used her account to promote Edcomm's banking education services; foster her reputation as a businesswoman; reconnect with family, friends, and colleagues; and build social and professional relationships. (Compl. ¶ 17.) Defendant Elizabeth Sweeney assisted Dr. Eagle in maintaining her LinkedIn account and had access to Dr. Eagle's password. (Id.) Edcomm, through its CEO, recommended that all employees participate in LinkedIn and indicated that the employees should list Edcomm as their current employer. (Def.'s Mot. Summ. J., Ex. 6.) Edcomm generally followed the policy that when an employee left the company, the company would effectively "own" the LinkedIn account and could "mine" the information and incoming traffic, so long as it did not steal that former employee's identity. (Def.'s Mot. Summ. J., Ex. 7.)

On June 20, 2011, immediately after Dr. Eagle was terminated from her position at Edcomm, she attempted, without success, to access her LinkedIn account. (Comp. ¶¶ 30-31.) The following day, Edcomm publicly announced that Defendant Sandy Morgan had been

2

appointed Interim Chief Executive Officer of Edcomm, Defendant Joseph Mellaci had been named Vice President of Global Markets, and Qamar Zaman had been named Financial Controller. (Id. ¶¶ 32-34.) Edcomm, using Dr. Eagle's LinkedIn password, accessed her account and changed the password so that Dr. Eagle could no longer access the account, and then changed Dr. Eagle's account profile to display Ms. Morgan's name and photograph. (Id. ¶¶ 39-40; Def.'s Mot. Summ. J., Ex. 1, Resp. to Interrog. No. 2.) According to the Complaint, these actions resulted in business contacts or potential customers of Dr. Eagle's, who were searching for her profile, being routed to a LinkedIn page featuring Ms. Morgan's name and photograph, but Dr. Eagle's honors and awards, recommendations, and connections. (Compl. ¶¶ 47-53.)

On July 1, 2011, Plaintiff initiated the present litigation against Defendants in this Court setting forth eleven causes of action, as follows: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C); (2) violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C); (3) violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) unauthorized use of name in violation of 42 Pa.C.S. § 8316; (5) invasion of privacy by misappropriation of identity; (6) misappropriation of publicity; (7) identity theft under 42 Pa.C.S. § 8315; (8) conversion; (9) tortious interference with contract; (10) civil conspiracy; and (11) civil aiding and abetting. (Id. ¶ 61-141.) Thereafter, Dr. Eagle contacted LinkedIn in efforts to regain access to the LinkedIn account. (Def.'s Mot. Summ. J., Ex. 1, Resp. to Interrogatory No. 2.) After not being able to access the account from late June 2001 through July 12, 2011, Dr. Eagle ultimately managed to regain access. (Id.) Nonetheless, she continued to be unable to receive messages on her account for a substantial period of time thereafter. (Id.)

On July 26, 2012, Defendant Edcomm filed the present Motion for Summary Judgment

on the entirety of the Complaint against it. Plaintiff filed her Response on August 6, 2012, and Edcomm filed a Reply Brief on August 21, 2012, making the Motion ripe for judicial consideration.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

### III. DISCUSSION

Edcomm's Motion offers three arguments in support of its request for summary judgment on Plaintiff's Complaint. First, it contends that Plaintiff's claims under the CFAA fail for lack of proof of cognizable damages. Second, it asserts that Plaintiff's Lanham Act claims cannot survive in light of Plaintiff's failure to produce any evidence of a "likelihood of confusion." Finally, assuming that all federal claims are dismissed, Edcomm argues that the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The Court

considers each argument individually.

### A. Computer Fraud and Abuse Act Claims

Edcomm first argues that Plaintiff has failed to come forward with any evidence from which a reasonable jury could find that she suffered a legally cognizable loss or damages in the brief period in which her LinkedIn Account was accessed and controlled by Edcomm. Absent such damages, Plaintiff, according to Edcomm, cannot maintain her CFAA claim.

The CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator." 18 U.S.C. § 1030(g). The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Courts have held that, to fall within this definition, the alleged "loss" must be related to the impairment or damage to a computer or computer system. Fontana v. Corry, No. Civ.A.10-1685, 2011 WL 4473285, at *7 (W.D. Pa. Aug. 30, 2011); see also Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio, No. Civ.A.09–2751, 2010 WL 4224473, *6 (E.D. Pa. Oct. 22, 2010) ("Various courts have interpreted 'loss' to mean the remedial costs of investigating a computer for damage, remedying damage done, and costs incurred while the computer is inoperable."). Thus, lost revenue resulting from an interruption of service or the inoperability of computers constitutes "loss" for purposes of the statute. Fontana, 2011 WL 4473285, at *7 (citing cases). Notably, however, a claim for future lost revenue due to the dissemination of trade secrets does not qualify as a "loss" under the CFAA. Clinton Plumbing, 2010 WL 4224473, at *6 (citing

6

cases). Likewise, harm to ongoing business ventures, *i.e.*, an alleged loss of business, is insufficient to show "loss." Fontana, 2011 WL 4473285, at *8. Finally, a "loss of assets, overdraft fees, returned check fees, late fees, reputational damages arising from a damaged credit score, and termination of certain contracts due to insufficient funds for payment" are insufficient to constitute loss. Clinton Plumbing, 2010 WL 4224473, at *7. Notably, a failure to prove a cognizable loss is a basis for a grant of summary judgment on a CFAA claim.

In the present case, the evidentiary basis for Plaintiff's CFAA damages claim is scant at best, consisting of (1) an interrogatory response propounded by Plaintiff at the start of litigation;[2] and (2) an argument in Plaintiff's Response Brief with one allegedly supportive exhibit. As to the first item, Edcomm posed an Interrogatory to Plaintiff regarding her purported damages. She responded, in mid-November 2011, as follows:

> Eagle objects to this Interrogatory as premature, particularly since she has not yet had discovery and her damages will be the subject of expert testimony. Subject to and without waiver of the foregoing general objections, Eagle describes her damages as including but not being limited to the following: (I) Eagle suffered damages in connection with her efforts to regain control of her LinkedIn account; (ii) Eagle incurred legal fees in connection with regaining control of her LinkedIn account, which including the drafting of the Complaint necessary to regain control over the account; (iii) Eagle's reputation was harmed by defendants' conduct in stealing her digital identity and trying to enhance their business by trading on Eagle's reputation. Eagle was unable to respond to inquiries and by all appearances was not interested in maintaining relationships with people with whom she had cultivated relationships for years. Furthermore, Edcomm and defendants misled some of Eagles' contacts about the nature of her and Brody's termination. By so doing, these contacts were led to believe that Eagle and Brody had voluntarily left Edcomm while Edcomm had outstanding obligations to those clients; (iv) the value of Eagle's LinkedIn account was devalued. This was an account she used to develop relationships with people to whom she sold many millions of dollars of services. For many contacts, LinkedIn was the best way to keep in touch with them, particularly because Eagle's only email

---

[2] Notably, Plaintiff does not present this interrogatory response as evidence. Rather, it is offered only by Defendant Edcomm.

7

> address on the account was her Edcomm address. Once Edcomm fired her and began to surreptitiously take over her account, Eagle was powerless to control how the LinkedIn account was being used; and (v) to date, Eagle has still been unable to respond to messages that were sent to the account for a substantial period of time. Upon information and belief, Eagle has missed out on professional opportunities by being unable to respond to these messages.
>
> Eagle intends to submit expert testimony about the damage to her reputation, name, LinkedIn account, and other aspects of her damages.

(Def.'s Mot. Summ. J., Ex. 1 at Resp. to Interrog. No. 3.) On its face, this discovery response is nothing but supposition without factual basis. See Palfrey v. Jefferson- Morgan Sch. Dist., No. Civ.A.06-1372, 2008 WL 4412230, at *20 (W.D. Pa. Sept. 25, 2008) ("To the extent that Plaintiff is relying on factual averments in her Answers to Interrogatories as evidence to create a genuine issue of material fact, the Court does not accept the same as the averments are merely suppositions based on 'the best of [her] personal knowledge, information and belief' made at the outset of her case and are not facts which can be considered by the Court at this stage."), aff'd, 355 F. App'x 590 (3d Cir. 2009); Maduro v. Am. Airlines, Inc., No. Civ.A.07-029, 2008 WL 901525, at *4 (D.V.I. Feb. 28, 2008) (declining to find genuine issue of material fact where non-moving party relied solely on allegations of complaint and unsupported allegations in interrogatory responses); Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp. 569, 583 (E.D. Pa. 1994) (noting that a party's quotation from its own answers to interrogatories fails to create genuine issues of material fact where those answers are mere allegations unsupported by deposition testimony, documents, or party admissions). Indeed, by Dr. Eagle's own representation in the first sentence, her answer is based not on any discovery, documentation, or other factual foundation, but rather purely on conjecture. "At summary judgment, a plaintiff

8

cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000). Accordingly, the Court does not find that this evidence creates a genuine issue of material fact as to the existence of cognizable damages.

Second, and in an apparent effort to clarify her damages claim, Plaintiff's Response in Opposition argues that, because Plaintiff did not have full access to her account for over twenty-two weeks and the messages sent to her during that period of time are lost forever, she was unable to receive "invitations to connect, business opportunities and ongoing communications with clients, potential clients and other business and personal contacts." (Pl.'s Resp. Opp'n Mot. Summ. J. 3.) She goes on to clarify that her "loss" consists of her lost reputation, relationships, and trust with her clients and potential clients, all caused by her inability to use her account for almost four months. (Id. at 4–5.) Finally, she attaches the Declaration of Peter Chatzky, who states that he had previously worked with Plaintiff on several projects and had contacted her in June 2011 about a "$100,000+ business opportunity for training services that would have been perfect." (Id., Ex. F.)

None of these allegations suffice to create a genuine issue of material fact as to the existence of cognizable damages under the CFAA for two reasons. Primarily, Plaintiff is not claiming that she lost money because her computer was inoperable or because she expended funds to remedy damage to her computer. Rather, she claims that she was denied potential business *opportunities* as a result of Edcomm's unauthorized access and control over her account. Loss of business opportunities, particularly such speculative ones as set forth in the

Chatzky Declaration,[3] is simply not compensable under the CFAA. Crown Coal & Coke Co. v. Compass Point Res., LLC, No. Civ.A.07-1208, 2009 WL 1806659, at *8 (W.D. Pa. June 23, 2009) (holding that claims for loss of potential business opportunities as a result of a defendant's unauthorized access are not compensable under the CFAA); see also Telquest Int'l, Corp. v. Dedicated Bus. Sys., Inc., No. Civ.A.06-5339, 2009 WL 3234226, at *1 (D.N.J. Sept. 30, 2009) (noting that plaintiff's allegation of lost revenue and customers as a result of defendant's unfair business practices not connected to actual damage to computers or computer systems "is not the type of revenue loss contemplated by section 1030(e)(11)") (citing Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 475–77 (S.D.N.Y. 2004) (concluding that damages under the CFAA are intended to be those related to fixing a computer, and not general profit losses)). Moreover, Plaintiff's claims of damage to her reputation and to the relationships she maintained with her clients do not suffice to rescue her claim. She asserts that her inability to respond to clients and potential clients damaged her goodwill and made her appear unresponsive. It is well-established, however, that "to the extent that Plaintiff claims lost revenue, loss of goodwill, and interference with his customers . . . such injuries are not cognizable losses under the CFAA." Dudick ex rel. Susquehanna Precision, Inc. v. Vaccarro, No. Civ.A.06-2175, 2007 WL 1847435,

---

[3] Defendant argues that the Chatzky Declaration should be stricken under Federal Rule Civil Procedure 37(c)(1) because, prior to the Opposition Brief, he was never disclosed by Eagle, whether in her initial disclosures or interrogatory responses and discovery has now closed. Rule 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Court agrees that Plaintiff's failure to previously disclose Mr. Chatzky as a witness is grounds for striking his Declaration. Nonetheless, the Court, out of an abundance of caution in light of Plaintiff's *pro se* status, considers the Declaration and finds that it has absolutely no probative value.

10

at *6 (M.D. Pa. June 25, 2007).

In addition, even if these types of damages were, under some theory, recoverable under the CFAA, Plaintiff has provided absolutely no evidence in support of such assertions or in an effort to quantify these damages. Rather, Plaintiff references only generalized loss of ability to speak with some unnamed and unknown "clients" and loss of potential and speculative business opportunities. She neglects to include a sworn declaration from herself attesting what such lost opportunities and reputation damages were. Further, although she remarks that she has sold substantially less training and consulting services than before and has not been invited to speak anywhere, she fails to ever make the clear and unbroken causal connection between such losses and her inability to use her LinkedIn account for a period of time. In other words, Plaintiff asks the Court to rely on pure conjecture to find—at this summary judgment stage of proceedings after all discovery has closed—that she suffered "loss" for purposes of the CFAA.[4] The Court declines

---

[4] Plaintiff attempts to justify her inability to produce evidence because she is "a Pro Se [plaintiff] with limited means" and has "not been able to afford to enlist an expert witness to more concretely quantify the damages." (Pl.'s Resp. Opp'n Mot. Summ. J. 4.) She goes on to argue that, despite the absence of evidence in support of her case, she is "confident that the court will find that the defendants acted willfully with full knowledge of their wrongdoing and the damage it would cause [her]." (Id.)

Plaintiff, however, misunderstands her obligations at this stage of the litigation. "'Pro se plaintiffs cannot be held to the same strict standards as attorneys, but they also cannot be excused from compliance with the plain text of the federal rules and court orders . . .'" Karakozova v. Trustees of Univ. of Pa., No. Civ.A.09-2564, 2011 WL 3349812, at *33 n.9 (E.D. Pa. Aug. 2, 2011) (quoting Palmer v. Sec. Nat. Bank, No. Civ.A.00-287, 2001 WL 877584, at *3 (E.D. Pa. June 13, 2001)). "[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." Frazier v. DiGuglielmo, No. Civ.A.06-4186, 2007 WL 2254411, at *1 (E.D. Pa. Aug. 3, 2007) (quoting Edwards v. INS, 59 F.3d 5, 8 (2d Cir. 1995)). Moreover, "pro se plaintiffs are not relieved of the obligation to set forth facts sufficient to survive summary judgment." Jacobs v. Cumberland Cnty. Dept. of Corr., No. Civ.A.09-0133, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010).

In the present matter, Plaintiff was represented by two different sets of counsel—one from a well-established Philadelphia firm and one from a New York firm—from July 2011

11

to do so and, thus, grants Defendant's Motion on this claim.

### B. Lanham Act Claims

Defendant Edcomm next seeks summary judgment on Plaintiff's Lanham Act claim. Specifically, it argues that Plaintiff has failed to produce any evidence of a likelihood of confusion, thus requiring a finding that no Lanham Act violation has occurred.

Section 43(a) of the Lanham Act, which governs federal unfair competition claims, provides in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
>
> . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). To prove a violation of this provision, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's

---

through April of 2012, and thus had the benefit of counsel's advice throughout much of the litigation and discovery period. Thereafter, Plaintiff, who is—by her own representations—a well-educated individual, elected to proceed *pro se* in this matter and has timely replied to Defendant Edcomm's Motion for Summary Judgment. Therefore, her failure to produce evidence of cognizable damages is not a result of her limited knowledge resulting from her *pro se* status, but rather her alleged financial limitations. The Court's obligation, however, is to determine whether there is a triable issue of fact for a jury. As Plaintiff cannot produce the required evidence in response to the Motion for Summary Judgment, nothing in the record indicates that she will be able to do so for a jury. Accordingly, our jurisprudence dictates that the Motion be granted as to Plaintiff's CFAA claim.

12

use of the mark to identify goods or services causes a likelihood of confusion." A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210–11 (3d Cir. 2000). The plaintiff bears the burden of proof on these elements. Id. at 211.

With respect to the third element, the United States Court of Appeals for the Third Circuit has found that a likelihood of confusion exists when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 862 (3d Cir. 1992) (internal quotation marks omitted). The Third Circuit, in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983), enumerated a nonexhaustive list of factors—also known as the "Lapp factors"—to be considered in determining whether there is a likelihood of confusion between marks:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the similarity of function;
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

13

Id. at 463. The Third Circuit has emphasized, however, that these factors do not necessarily apply to every case, particularly where, as here, there is no comparison between two competing goods. Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1020 (3d Cir. 2008); see also A&H Sportswear, 237 F.3d at 207 ("Although all of the factors can be useful, the Lanham Act does not required that [the Lapp factors] be followed precisely so long as the relevant comparisons suggested by the list are made.").

Applying a modified version of the Lapp factors, the Court finds no such likelihood of confusion in this case. Plaintiff's Lanham Act claim alleges that:

> In connection with Edcomm's services, Defendants have used and continue to use Dr. Eagle's name and LinkedIn account without Dr. Eagle's permission in a manner that is likely to cause confusion, cause mistake, or deceive members of the industry and potential customers as to the affiliation, connection, or association of Dr. Eagle with Ms. Morgan and/or Edcomm and/or to suggest, imply, and/or represent approval of Edcomm's services, and/or to cause confusion, mistake, or deception as to the sponsorship or approval of Ms. Morgan and Edcomm by Dr. Eagle.

(Compl. ¶ 77.) The undisputed facts of record, however, show that upon Dr. Eagle's termination from Edcomm, Defendants accessed her LinkedIn account and changed it to reflect Sandy Morgan as interim CEO of Edcomm, including Morgan's photo and information. (Def.'s Mot. Summ. J., Ex. 1, Resp. to Interrog. No. 2.) Thus, anyone who navigated to Dr. Eagle's LinkedIn account would be met with Ms. Morgan's name, photograph and new position, with Dr. Eagle's name and photograph being completely deleted from the account. As such, there was no effort by Defendant to "pass off" Ms. Morgan as Dr. Eagle or to suggest that Dr. Eagle endorsed or was affiliated with Edcomm. Moreover, Plaintiff conceded that clients who found Sandy Morgan's

picture and name on Dr. Eagle's LinkedIn profile would not send messages to the account for fear they would be delivered to Ms. Morgan. (Def.'s Mot. Summ. J., Ex. 2, Resp. to Interrogatory No. 3.) This statement is a clear recognition that someone viewing the account would not be confused into believing that Ms. Morgan was Dr. Eagle or that Dr. Eagle remained affiliated with Edcomm. In addition, there was only an approximate two week span of time that Dr. Eagle's LinkedIn account actually showed Ms. Morgan's name and photograph, after which time the account was restored to Dr. Eagle. Such a brief period mitigates any possibility of confusion. Finally, although not fatal to her claim, Plaintiff's failure to put forth any evidence of actual confusion weighs against a finding of likelihood of confusion.[5]

In an effort to sustain this claim, Plaintiff makes no effort to analyze any of the Lapp factors or submit any evidence on which the Court could find likelihood of confusion. Rather, her response to this portion of Defendant's Motion consists of a single paragraph, as follows:

> I have provided several examples of the confusion that was caused by the theft of my LinkedIn account to the Defendants. . . . It is important to realize that the examples I have are only those who happened to have an alternative email address with which to contact me. Most contacts only had my corporate email address (which I was no longer able to access) and LinkedIn as means to contact me and so their confusion went unanswered. I am also attaching a statement from a business colleague regarding his confusion and inability to contact me as Exhibit F.

(Pl.'s Resp. Opp'n Mot. Summ. J. 2.) This argument, however, conflates the "likelihood of confusion" between the different individuals portrayed on the LinkedIn accounts with the actual

---

[5] "Evidence of actual confusion is not required to prove likelihood of confusion." Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 291 (3d Cir. 2001). Nonetheless, it remains a relevant consideration. The remaining Lapp factors are not relevant to this case and, as such, the Court does not address them.

15

confusion experienced by individuals when determining how to contact Dr. Eagle. This Court's review of the attached e-mails reveals that the senders went to Dr. Eagle's LinkedIn account, found Ms. Morgan's name and photograph, and thereafter contacted Dr. Eagle through alternative means. (Id. at Ex. A–D, & F.) These individuals did not, according to their e-mails, believe that Ms. Morgan was Dr. Eagle, or vice versa. More simply put, any confusion that occurred was not about Dr. Eagle's "affiliation, connection, or association" with Edcomm or Ms. Morgan. 15 U.S.C.A. § 1125(a)(1)(A). Rather, it was why an account that previously linked the user with Dr. Eagle was now directing the user to an account affiliated with Ms. Morgan. Stated differently, Defendant's actions merely caused a diversion, not a likelihood of confusion. See Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1148 (9th Cir. 2011) (holding that use of another's trademark as a search engine keyword did not violate the Lanham Act simply because of the possibility that potential customers might be diverted to another site, and concluding that "because the *sine qua non* of trademark infringement is consumer confusion, . . . the owner of the mark must demonstrate likely confusion, not mere diversion").

At this summary judgment stage of litigation, Plaintiff bears the burden of producing sufficient evidence on which a reasonable jury could find a likelihood of confusion caused by Defendant's actions. Having had approximately a year of discovery, Plaintiff has failed to adduce any such evidence. Accordingly, the Court must grant summary judgment on Lanham Act cause of action in this case.

### C.    State Law Claims

Via its final argument, Defendant Edcomm contends that, having dismissed all of the

16

federal law claims, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The Court disagrees.

Under 28 U.S.C. § 1367, "a district court has authority to exercise supplemental jurisdiction over non-federal claims arising from the same case or controversy as the federal claim." De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 308 (3d Cir. 2003). "The purpose of supplemental jurisdiction is to promote convenience and efficient judicial administration." Resnick v. Lower Burrell Police Dept., No. Civ.A.09-893, 2010 WL 88816, at *3 (W.D. Pa. Jan. 8, 2010). When the district court dismisses all of the claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009). In order to determine whether supplemental state law claims should be dismissed when the federal law claims have been eliminated before trial, the court must consider the balance of factors including judicial economy, convenience, fairness, and comity. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Neither party in this case has engaged in a discussion of the foregoing factors. The Court, however, finds that the balance of such factors advocate in favor of exercising jurisdiction over Plaintiff's supplemental state law claims. The case has been pending in the federal system for more than a year and the Court is quite familiar with both the parties and the claims. Moreover, Defendant maintains several state law counterclaims which have not been dismissed from this case and which are based on the same operative facts as Plaintiff's state law claims. Finally, trial on this matter is scheduled for less than two weeks from the date of this opinion. Given all of

these considerations, judicial economy, convenience, fairness, and comity would not be well-served by the last minute dismissal of Plaintiff's state law causes of action. Accordingly, the Court will exercise supplemental jurisdiction over all remaining claims.[6]

## IV. CONCLUSION

In sum, the Court will grant Defendant Edcomm's Motion for Summary Judgment as to Plaintiff's claims under the Computer Fraud and Abuse Act (Counts I and II), in light of Plaintiff's failure to produce any evidence of cognizable damages. Additionally, the Court grants summary judgment in favor of Edcomm on Plaintiff's Lanham Act claim (Count III) absent any genuine issue of material fact as to the "likelihood of confusion" element. The Court, however, retains supplemental jurisdiction over the remaining state law claims and directs the parties to prepare for the October 16, 2012 trial date previously set in this case.

---

[6] Via a one-sentence footnote accompanying by a string citation, Edcomm seeks summary judgment on Plaintiff's conversion claim (Count VIII) "for the independent basis that under well-settled Pennsylvania law, an intangible, such as the Account, is not the proper subject of a conversion claim." (Def.'s Mem. Supp. Mot. Summ. J. 13 n.9.) As Defendant has failed to properly raise and brief this issue, the Court will not consider, let alone grant, summary judgment as to the conversion claim. See John Wyeth & Brother Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").