## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA EAGLE, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  11-4303 |
| SANDI MORGAN, HAITHAM SAEAD, | : | |
| JOSEPH MELLACI, ELIZABETH | : | |
| SWEENEY, LISA ARNSPERGER, | : | |
| QAMAR ZAMAN, and EDCOMM, INC., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S . J.                                                    March 12, 2013

## I.  FINDINGS OF FACT

The following consists of the facts of this case upon which Part II, the Conclusions of

Law, are based.

Plaintiff Linda Eagle is a resident of the State of New York and received her triple

doctorate in communications, business, and psychology from Temple University in 1980.

(Stipulation 6; N.T. 20:13–16.)  Together with Clifford Brody, she founded Defendant Edcomm,

Inc. ("Edcomm"), which is a banking education company that provides services on-line and in

person to the banking community.  David Shapp was also a shareholder.  (N.T. 40:5–22;

43:13–44:17.)  Defendant has admitted that Dr. Eagle was well-published in banking industry

publications, was quoted in newspapers and magazines, and presented at industry conferences

around the world.  (N.T. 17:3–11.)  Further, Clifford Brody testified as to Plaintiff's extensive

experience with multiple corporations in the banking education industry and about her repeated

generation of substantial annual sales.  (N.T. 107:2–112:6.)

On October 7, 2010, a company named Sawabeh information Services Company ("SISCOM") entered into a term sheet with Eagle, Brody and Shapp wherein SISCOM purchased all of the outstanding common shares of Edcomm.  The three individuals remained employed by Edcomm as executives, but they were involuntarily terminated by defendant Haitham Saead on June 20, 2011.  (N.T. 54:2–17.)  This lawsuit followed soon thereafter, the principal thrust of which is the alleged illegal use of Eagle's LinkedIn account by Edcomm, to her economic detriment.

The background of this allegation essentially starts with Brody's decision, made sometime in or before May of 2009, to use LinkedIn as a sales and marketing tool for the Edcomm business.  LinkedIn is a business-oriented social networking site accessible through the internet for contacting current and potential business acquaintances and allowing users to invite other LinkedIn users to "connect" and communicate directly via e-mail.  (N.T. 100:3–101:11; 105:19–25.)  As the CEO at the time, Brody found that "LinkedIn was awesome" for marketing, and he testified enthusiastically about it.  (N.T. 100:7–23; 101:3–11.)  On May 3, 2009, Plaintiff created her own LinkedIn account using her Edcomm e-mail address.  (N.T. 49:18–51:5.)  Per the LinkedIn  "User Agreement," however, the account belonged to Eagle alone and she was individually bound by the User Agreement.[1]  (Defs.' Ex. E.)

As time passed, it became the policy for Edcomm not only to urge employees to create LinkedIn accounts, but also to become involved in the account content.  (N.T. 128:2–9;

---

[1]  Specifically, this User Agreement states, "If you are using LinkedIn on behalf of a company or other legal entity, you are nevertheless individually bound by this Agreement even if your company has a separate agreement with us."  (Defs.' Ex. E.)

130:23–131:23.)  To this end, Edcomm developed employee policies covering on-line content. Notably, however, Edcomm did not require that employees have LinkedIn accounts.  (N.T. 125:10-117.)  Moreover, at no time did Edcomm pay for its employees'— including Dr. Eagle's—LinkedIn accounts.  (N.T. 124:13–125:9.)  In other words, although Edcomm did not require employees to maintain LinkedIn accounts or subsidize the maintenance of such accounts, it provided guidelines if an employee wanted to participate.  (N.T. 132:11–18.)  It is also clear that Edcomm became concerned about LinkedIn accounts and former employees.  An email chain on March 2, 2010, encapsulates this concern:

> From:  Cliff Brody
> Sent:  Tuesday, March 2, 2010  1:36 PM
> To:  Linda Eagle; David Shapp; Kathy Luczak
> Subject:  few loose ends
> David....
> Can you look into what our requirements/responsibilities are as far as LinkedIn accounts and former employees.
> CB
> Clifford G. Brody
> Founder & Chief Executive Officer
> The Edcomm Group Banker's Academy
>
> From:  David Shapp
> Sent:  Tuesday, March 2, 2010  2:17 PM
> To:  Cliff Brody; Linda Eagle; Kathy Luczak
> Subject:  few loose ends
> I think we can leave it up forever and mine the information contained within as long as we do not pretend to be her.  The company/employer owns all data on its hardware, including email archives.  The employee has no rights at all in his email identity.  Ordinarily, as a courtesy, employers tend to keep old accounts active for a limited time in order to avoid rejecting business-related communications, and forward personal emails to the former employee.  There would potentially be an issue if the employer used the former employee's email to perpetuate a false impression that the employee remained with the company, but simply mining the incoming traffic is certainly within the employer's rights.
> David
> David Shapp
> Partner & Senior Vice President
> The Edcomm Group Banker's Academy

From:  Cliff Brody
Sent:  Tuesday, March 2, 2010  3:23 PM
To:  David Shapp; Linda Eagle; Kathy Luczak
Subject:  few loose ends
What about LinkedIn – not on our hardware.  The question is who really owns that account?  Ideally it would be us.  We could leave it up as-is and she would have to create a new one.
CB
Clifford G. Brody
Founder & Chief Executive Officer
The Edcomm Group Banker's Academy

From:   David Shapp
Sent:  Tuesday, March 2, 2012  3:53 PM
To:  Cliff Brody; Linda Eagle; Kathy Giola
Subject:  few loose ends
We do.  It was created with an email account that is ours, on our computers, on our time and at our direction.  She cannot use that account because she does not own the email address that opened it.  I think as long as we just read from it and do not write to it, we are not breaking any laws.  Same thing with her email account – as long as we only read and do not write, we are within our rights to do so.
David
David Shapp
Partner & Senior Vice President
The Edcomm Group Banker's Academy

(Defs.' Ex. T.)

     While these emails and other Edcomm actions evidence an intense interest in the issue involving ownership of LinkedIn accounts, it is clear that on June 20, 2011—the day on which Edcomm terminated Dr. Eagle—no policy had been adopted to inform the employees that their LinkedIn accounts were the property of the employer.  Whether such a policy would be legally valid under the contract created between LinkedIn customer and an individual user is obviously not an issue before the Court in light of the finding made in this case that no such policy existed.

     Sometime prior to her termination, Dr. Eagle gave her password to the LinkedIn account

to certain Edcomm employees.[2]  (N.T. 58:24–59:17.)  The primary purpose of sharing her password seems to have been to enable those employees to respond to certain matters in Dr. Eagle's account, such as invitations, and also to permit updating of the account.  (N.T. 57:21–58:14.)  When Dr. Eagle was terminated, Edcomm employees accessed her LinkedIn account and changed its password, effectively locking her out of the account.  The parties stipulated that from June 20, 2011 to July 6, 2011, Edcomm had full control of the account.  (Stipulation 2.)  On July 7, 2011, LinkedIn took over the account and, by July 14, 2011, Dr. Eagle had regained access to the account.  (Stipulation 3.)  It appears, however, that, due to some unknown events occurring while the account was in the hands of LinkedIn, Eagle lost messages from June 20, 2011 to October 7, 2011, although this is not totally clear.  (N.T. 63:2–15; 69:7–13.)  Dr. Eagle's Exhibit 9 contains a self-serving statement from her claiming she had not received messages since July.  (Pl.'s Ex. 9.)  This conflicts somewhat with the stipulation that, while LinkedIn did in fact take control of the account on July 7, 2011, and neither Edcomm or Eagle could use it, LinkedIn provided access to the account to Eagle by July 14, 2011.  (N.T. at 14:7–11.)  In any event, neither party disputes that, from at least October 7, 2011, Plaintiff has had full access to and control over her LinkedIn account.  (N.T. 93:8–16.)

It is clear that Edcomm gave public notice that Eagle was no longer affiliated with the company within a week of her termination.  (Defs.' Ex. H; N.T. at 54:2-11.)  This information, however, did not appear on what had been Dr. Eagle's LinkedIn account.  Although it is not entirely clear from the testimony or the Exhibits what someone accessing Dr. Eagle's LinkedIn

---

[2] This was contrary to the agreement with LinkedIn by which the user agrees to keep her password secure and confidential and not permit others to use her account.

page saw when Edcomm had control of the LinkedIn account from June 20, 2011 to July 6, 2011,

both parties appeared to concede that the page reflected the name, picture, education, and

experience of Sandi Morgan, the newly-appointed Interim CEO of Edcomm.  (Pl.'s Ex. 51.)  The

evidence reflects, however, that some information related to Dr. Eagle had not been fully deleted

from the site, such as her honors and awards.  (N.T. 72:5–10.)  It further appears that either a

Google search for "Linda Eagle" or a search for "Linda Eagle" on LinkedIn during the time

Edcomm had control of the account would direct the searcher to a LinkedIn account named

"Linda Eagle" at the URL "http://www.linkedin.com/in/ lindaeagle."  Clicking on that link would

bring the user to Eagle's LinkedIn account, which now bore the name, picture, and credentials of

Sandi Morgan.  (Pl.'s Ex. 49, 50, & 51; N.T. 72:23–73:4.)

Ultimately, as referred to previously, Edcomm had exclusive control of the Linda Eagle

LinkedIn account from June 20, 2011 to July 6, 2011.  In the Conclusions of Law which follow,

the significance of such conduct by Edcomm will be discussed.

By way of explaining her damages, Eagle offered testimony of Clifford Brody to explain

her average number of sales over the past five years and how, even using the lowest number, she

would have damages of $248,000 (see generally N.T. 114–121).  Specifically, the following

exchange constitutes the extent of Plaintiff's effort to quantify the damages causally related to

Edcomm's tortious actions:

> Q.      So, Mr. Brody, before lunch we were talking about my sales, and now I want
>         to go back to my sales numbers for a moment and ask you to tell the court
>         what my average sales per year were for about the last five years.
> . . .
> A.      Your average sales over the last five years—
> Q.      Annual sales, right.
> A.      —was over $3 million a year.

Q.      Okay.  And I'm going to ask you how you know this.  Where you get this number from for the record, please?

A.      That's my job to know.  I analyzed our sales numbers on a weekly basis, and you were, of course, our, by far leading sales person, and so I do know.

Q.      Do you have a recollection of what my strongest year; my highest year looked like?

A.      Yes, I do.  It was $6.6 million.

Q.      Okay.  So you have a recollection of what my lowest year, looking at the last five years was?

A.      $1.6 million.

Q.      And do you have—and I know that this is something that was tracked, but do you know in those sales, what percentage was to existing clients as opposed to non-existing clients?

A.      Yes, I do.

Q.      Or contacts, let me not even say clients.

A.      Yes, I do.  Your sales to existing contacts was over 70% of our total sales.

Q.      Okay.  And how do you know that?

A.      Again, as you said, we track that very closely because that tells us exactly how we should be reaching out; whether we should be reaching out primarily to new clients—or to new contacts, to existing contacts.

Q.      Thank you.  And I ask that specifically—you're not just pulling a number, you're stating something that was tracked?

A.      That's correct.

Q.      So, then, if I were to say that I was averaging 70%, just using our number, of 3 million per year to existing contacts, that would be 2.1 million per year in sales to existing contacts.

A.      That's correct.

Q.      Is that correct?  If we used my lowest number, my lowest year.

A.      1.6 million

Q.      1.6 million, and if we took 70%, and let's even say 70% of 1.5 million—

. . .

Q.      So, would you say that's $1.05 million per year that I sold to existing contacts in my lowest sale year?

A.      Correct.

Q.      Okay.  How many contacts did I have in LinkedIn at the point at which my account was no longer mine?

A.      About 4,000.

Q.      So, is it fair to say that I sold, and I'm going to round it here, but is it fair to say that I sold a million dollars' worth of work to this population of 4,000 contacts.

A.      Exactly.

Q.      So, I'm going to divide yet further.  I have 4,000 contacts.  I have a million dollars.  So, that divides to $250 in sales per year per contact?  I'm trying to

get at the value of the contact. I'm not saying that I sold $250 to every contact. I'm asking you as a person who was evaluating the data if that is what that data means?

. . .

Q.   Right. So I have a million dollars, and I'm dividing it by 4,000 contacts, because it's in those 4,000 contacts that I sold a million dollars and I'm trying to put a dollar value on that contact. And so, when I do that division, I come up with $250 per contact.

A.   Per contact, per year.

Q.   Per contact, per year.

A.   Correct. Exactly.

. . .

Q.   Okay. Now, going back to my LinkedIn account, which you were very close to, and when my LinkedIn account was taken away from me and you were helping me to determine how to—what needed to be done to get it back, how long did I not have full working LinkedIn?

A.   Over three months.

Q.   Okay. So, if each of those contacts is worth four months, a quarter of 250—

A.   Three months.

Q.   For three months. Thank you. A quarter of $250—if we can do that math, I am saying that each of those contacts is worth $62 per three months.

A.   Correct.

Q.   So, if you follow my math, I can go through the math again. So, I'm saying $250 per year. Id didn't have it for three months, $62 per contact.

A.   Yes.

Q.   And you stated that I had approximately 4,000 of them, and you used—or I used my lowest—I asked you to use my lowest year when you were looking at my math there; the year that I sold 1.5 million as opposed to when I sold 6.5 million plus. And so, using that number, if I calculate that, I'm going to calculate a loss of approximately 4,000 people at $62, the lowest possible number I could use, which is $248,000.

A.   Correct.

Q.   And I mean, we can check the math. You can trust my—I'm doing the math here. And if we had used my average sale instead of my low number, that would go up considerably?

A.   About twice that.

Q.   It would be about twice that. So, instead of 248, it would be close to 500,000?

A.   Correct.

Q.   Would be—twice that would be $496,000 that I was denied by not having my LinkedIn for three months. So, are you saying that—are you suggesting that if you were trying to quantify in our role in charge of sales and sales strategy, that there's a loss of between $248,000 and 496,000 in three months to

existing contacts?

A.    Correct.

Q.    Okay.  And does that include new contacts who did not come to LinkedIn?

A.    No, it does not.  New contacts would not have been part of this calculation.

Q.    Okay.

A.    We were just using existing contacts.

Q.    Could you quantify relationships that were permanently damaged as a result of my lack of responsiveness?

A.    Really, there is no way to quantify how many relationships were damaged, how many were completely destroyed, how many were harmed just a little bit.  There's really no way to quantify that.

(N.T. 114:11–121:2.)  Notably, Plaintiff presented no evidence of a connection of this figure to her loss of the LinkedIn account for the above-mentioned time.  Moreover, Plaintiff presented no damage calculation in response to written discoveries.  As such, it would be pure guesswork for the Court to determined damages based on the evidence or lack of evidence presented.

On July 1, 2011, just prior to contacting LinkedIn in an effort to regain access to the account, Plaintiff initiated the present litigation against Defendants in this Court setting forth eleven causes of action, as follows: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C); (2) violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C); (3) violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) unauthorized use of name in violation of 42 Pa.C.S. § 8316; (5) invasion of privacy by misappropriation of identity; (6) misappropriation of publicity; (7) identity theft under 42 Pa.C.S. § 8315; (8) conversion; (9) tortious interference with contract; (10) civil conspiracy; and (11) civil aiding and abetting.  (Id. ¶ 61-141.)   Via Memorandum issued October 4, 2012, the Court granted Defendant Edcomm's Motion for Summary Judgment as to Plaintiff's claims under the Computer Fraud and Abuse Act (Counts I and II) and as to Plaintiff's Lanham Act claim (Count III).  Accordingly, Plaintiff's sole remaining causes of action sound in state law.  Additionally, Defendant Edcomm proceeds on its

own counterclaims of misappropriation and unfair competition.[3]

## II.   CONCLUSIONS OF LAW

Having made the foregoing findings of fact, the Court is now tasked with reaching conclusions of law on the various causes of action at issue.   Plaintiff brings eight separate causes of action, while Defendants raise three individual counterclaims.   The Court addresses each individually.

### A.   Plaintiff's Causes of Action Against Defendant Edcomm[4]

#### 1.   Unauthorized Use of Name in Violation of 42 Pa.C.S. § 8316

Plaintiff's first cause of action arises under 42 Pa.C.S. § 8316, which states that "[a]ny natural person whose name or likeness has commercial value and is used for any commercial or advertising purpose without the written consent of such natural person or the written consent of any of the parties authorized in subsection (b) may bring an action to enjoin such unauthorized use and to recover damages for any loss or injury sustained by such use."   42 Pa. Cons. Stat. § 8316(a).   The statute defines "Name" or "Likeness" as "[a]ny attribute of a natural person that serves to identify that natural person to an ordinary, reasonable viewer or listener, *including*, but

---

[3]  At trial, defense counsel voluntarily withdrew Edcomm's conversion claim.   (N.T. 199:20–200:15.)   The Court, therefore, addresses it no further in this Memorandum.

[4]  Notably, Plaintiff has presented no evidence regarding the individual actions of Defendants Sandy Morgan, Haitham Saed, Joseph Mellaci, Elizabeth Sweeney, Lisa Arnsperger, or Qamar Zaman.   They were not called as witnesses.   Indeed, there was scarce if any mention of their names during the trial of this case.   Plaintiff attempted to introduce into evidence some email exchanges among Defendants Lisa Arnsperger, Elizabeth Sweeney, Sandy Morgan, and Brandy Long regarding their participation in the accessing of Eagle's LinkedIn account.   (N.T. 31:8–32:9 (referencing Pl's Exs., 30, 40, 41, & 42).)   Aside from the fact that these emails were never authenticated, they constitute pure hearsay and, thus, may not be considered.   Accordingly, the Court cannot find the individual Defendants liable on any ground and must enter judgment in their favor, thereby leaving Edcomm as the sole remaining Defendant.

not limited to, *name*, signature, photograph, image, likeness, voice or a substantially similar imitation of one or more thereof." Id. § 8316(e) (emphasis added).  It goes on to note that "Commercial value" means "[v]aluable interest in a natural person's name or likeness that is developed through the investment of time, effort and money." Id.; see also Facenda v. N.F.L Films, Inc., 542 F.3d 1007, 1027 (3d Cir. 2008).  Finally, the statute explains that "commercial or advertising purpose" means:

> (1) Except as provided in paragraph (2),[5] the term shall include the public use or holding out of a natural person's name or likeness:
>> (I) on or in connection with the offering for sale or sale of a product, merchandise, goods, services or businesses;
>> (ii) for the purpose of advertising or promoting products, merchandise, goods or services of a business; or
>> (iii) for the purpose of fundraising.

42 Pa. Cons. Stat. § 8316(e).

Based on the foregoing findings of fact, the Court concludes that Plaintiff has met her burden of proving all the elements of this claim.  Plaintiff presented ample testimony that the

---

[5] Paragraph (2) of this definition states that:

The term shall not include the public use or holding out of a natural person's name or likeness in a communications medium when:

(I) the natural person appears as a member of the public and the natural person is not named or otherwise identified; (ii) it is associated with a news report or news presentation having public interest; (iii) it is an expressive work; (iv) it is an original work of fine art; (v) it is associated with announcement for a commercial or advertising purpose for a use permitted by subparagraph (ii), (iii) or (iv); or (vi) it is associated with the identification of a natural person as the author of or contributor to a written work or the performer of a recorded performance under circumstances in which the written work or the recorded performance is lawfully produced, reproduced, exhibited or broadcast.

Id.

name "Dr. Linda Eagle" has commercial value due to her investment of time and effort in developing her reputation in the banking education industry.  She testified that she is a published authority, has been quoted in others' publications, and has presented at conferences.  (N.T. 33:12–16.)  Further, Mr. Clifford Brody testified that Plaintiff had extensive experience in the banking education industry and generated substantial annual sales.  (N.T. 107:2–112:6.)  Defendants, on the other hand, offered no rebuttal to such testimony and made no effort to show that the name "Dr. Linda Eagle" lacked in commercial value.

Moreover, Plaintiff established that Defendant Edcomm used her name, without her consent, for commercial or advertising purposes.  Plaintiff's Exhibits 49 and 50 demonstrate that an individual conducting a search on either Google or LinkedIn for Dr. Eagle, during the time period when Defendant Edcomm had control of Dr. Eagle's account, by typing in "Linda Eagle," would be directed to a URL for a web page showing Sandi Morgan's name, profile, and affiliation with Edcomm Group Banker's Academy.  (Pl.'s Exs. 49 & 50.)  In other words, by looking for Dr. Eagle, an individual would unwaringly be put in contact with Edcomm despite the fact that Dr. Eagle was no longer affiliated with Edcomm and did not consent to Edcomm's use of her name.  In turn, Edcomm obtained the commercial benefit of using Eagle's name to promote the services of its business.  Such actions by Edcomm reflect its improper use of her name for the purpose of advertising and/or promotion.  Ultimately, this set of events constitutes a violation of 42 Pa.C.S. § 8316.

## 2.    Invasion of Privacy by Misappropriation of Identity

"For claims of invasion of privacy, Pennsylvania has adopted the tort of intrusion upon seclusion as set forth in the Restatement (Second) of Torts § 652B and its comments."  Feinberg

v. Eckelmeyer, No. Civ.A.09-1536, 2009 WL 4906376, at *8 n.5 (E.D. Pa. Dec. 16, 2009).  "To

be liable for appropriation of name or likeness under the Restatement (Second) of Torts, 'a

defendant must have appropriated to his own use or benefit the reputation, prestige, social or

commercial standing, public interest or other values of plaintiff's name or likeness.'"  Wallace v.

MediaNews Grp., Inc., No. Civ.A.12-872, 2013 WL 214632, at *4 (M.D. Pa. Jan. 18, 2013)

(quoting Restatement (Second) of Torts § 652C cmt. c).  The Restatement (Second) of Torts

describes a tortfeasor who has committed an invasion of privacy by appropriation of name or

likeness as "[o]ne who appropriates to his own use or benefit the name or likeness of another."

Restatement (Second) of Torts § 652C.  "Invasion of privacy by appropriation of name or

likeness does not require the appropriation to be done commercially."  Rose v. Triple Crown

Nutrition, Inc., No. Civ.A.07-0056, 2007 WL 707348, at *3 (M.D. Pa. Mar. 2, 2007) (citing

Restatement (Second) of Torts § 652C cmt. b. (1977)).

 Attempting to defend against this claim, Defendant Edcomm focuses on the fact that it

did not attempt to use Dr. Eagle's likeness and credentials on the account page during the two-

week period in which Edcomm had control of Plaintiff's LinkedIn account,.  This argument,

however, disregards its use of her name to initially direct users to that page.  As noted above,

Plaintiff had a privacy interest not just in her picture and resume, but in her name.  There is

sufficient evidence that the name "Dr. Linda Eagle" had the benefit of reputation, prestige, and

commercial value within the banking education industry.  While Defendant updated the home

page of the LinkedIn account to mostly reflect Sandi Morgan's information, Defendant

maintained that home page under a URL containing Dr. Eagle's name.  Thus, someone searching

for Dr. Eagle on LinkedIn would be unwittingly directed to a page with information about Ms.

Morgan and Edcomm.  Such a scenario could be deemed to be "appropriat[ing] to [Edcomm's] own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of plaintiff's name."  Accordingly, the Court finds that Defendant has committed the tort of invasion of privacy by misappropriation of identity.

### 3.    Misappropriation of Publicity

Plaintiff's third cause of action alleges that Defendant Edcomm committed misappropriation of publicity.  Pennsylvania recognizes a right of publicity.  Rose, 2007 WL 707348, at *2–3; World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc., 280 F. Supp. 2d 413, 443–44 (W.D. Pa. 2003); Brockum Co. v. Blaylock, 729 F. Supp. 438, 445 (E.D. Pa. 1990); Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc., 627 F. Supp. 856, 862 (E.D. Pa. 1985).  "A defendant violates a plaintiff's right of publicity by 'appropriating its valuable name or likeness, without authorization, [and using] it to defendant's commercial advantage.'"  World Wrestling Fed'n, 280 F. Supp. 2d at 443–44 (quoting Phila. Orchestra Ass'n v. Walt Disney Co., 821 F. Supp. 341, 349 (E.D. Pa. 1993)).  This right grants a person an exclusive entitlement to control the commercial value of his or her name or likeness and to prevent others from exploiting it without permission.  Eagle's Eye Inc., 627 F. Supp. at 862.  "[A]lthough similar, the right of publicity is not identical to invasion of privacy by appropriation of name or likeness."  Rose, 2007 WL 707348, at *3.  "[T]he right of publicity protects against commercial loss caused by appropriation of a name or likeness.  In other words, the invasion of privacy by appropriation of name or likeness is a personal right created to protect one's privacy, while the right of publicity more closely resembles a property right created to protect commercial value."  Id.

For the same reasons set forth regarding the two previous torts, the Court likewise finds

that Defendant has committed the tort of misappropriation of publicity.  Plaintiff maintains an exclusive right to control the commercial value of her name and to prevent others from exploiting it without permission.  By using Plaintiff's password to enter her LinkedIn account, changing the password to block Dr. Eagle from entering it, and then altering her account to reflect Sandi Morgan's information—in lieu of simply creating a new LinkedIn account for Ms. Morgan—Defendant Edcomm deprived Plaintiff of the commercial benefit of her name.  As stated previously, as a result of Edcomm's actions, a person who was specifically searching for Dr. Eagle in connection with business opportunities would unwittingly be directed to an Edcomm webpage with Sandi Morgan's name, picture, and credentials.  This result clearly provided promotional benefit for Edcomm and constitutes the appropriation of a name for commercial use.  Such actions therefore rise to the level of tortious activity.

### 4.   Identity Theft

Plaintiff next alleges that Defendant Edcomm committed the crime of identity theft for which she is entitled to civil damages under 42 Pa.C.S. § 8315.  The crime of identity theft is defined as follows: "A person commits the offense of identity theft of another person if he possesses or uses, through any means, identifying information of another person without the consent of that other person to further any unlawful purpose."  18 Pa. Cons. Stat. § 4120(a). "Identifying information" is defined as "[a]ny document, photographic, pictorial or computer image of another person, or any fact used to establish identity, including, but not limited to, a name, birth date, Social Security number, driver's license number, nondriver governmental identification number, telephone number, checking account number, savings account number, student identification number, employee or payroll number or electronic signature."  Id. at §

4120(f).

Unlike with the prior causes of action, the Court does not find that Plaintiff has established this cause of action by a preponderance of the evidence. First, unlike the previous causes of action, identity theft requires some unlawful possession of a person's identifying information. Wallace v. MediaNews Grp., Inc., No. Civ.A.12-872, 2013 WL 214632, at *6 (M.D. Pa. Jan. 18, 2013) ("To be in violation of this statute, one must be in possession of identifying information of another without their consent and use that information to further an unlawful purpose . . . There is no evidence the Wallace's mug shot was 'stolen.' The mug shot was apparently obtained for police files and was part of the public record."). Dr. Eagle's name was publicly available and thus not unlawfully possessed. Moreover, the mere use of Plaintiff's name to direct a user to an Edcomm-related website and to "keep [Eagle] from her personal account," (N.T. 35:23–24), while perhaps unscrupulous, is not so clearly an "unlawful" purpose under the meaning of the statute such that it constitutes identity theft.

As to the actual account page, both parties agree that the LinkedIn home page to which users searching for Dr. Eagle were directed contained Sandi Morgan's name, photograph, profile summary, experience, and education. (Pl. Ex. 51.) Although Defendant concedes that the "Honors and Awards" portion of the profile was actually that of Dr. Eagle, this information is not "identifying information" such that it could have been used to establish Dr. Eagle's identity. Indeed, in all logic, a person directed to this page could not reasonably believe that the page was intended to identify Dr. Eagle. Rather, a reasonable individual, while perhaps confused as to *how* he or she arrived at this page, would have no doubt that the page belonged to Ms. Morgan and was describing Ms. Morgan's resume. Even assuming Plaintiff's "honors and awards" could be

16

deemed identifying information, Plaintiff presented no testimony to show that that information

was taken and used for an "unlawful purpose."  Rather, the evidence reflects that this information

was inadvertently left on the profile page despite Defendant Edcomm's efforts to delete all of

Plaintiff's other identifying information.  Accordingly, the Court finds no merit to this cause of

action.

> ### 5.   Conversion

Plaintiff's next claim alleges that by "hijacking" her LinkedIn account, Defendant has

effectively committed the tort of conversion.  "Conversion is a tort by which the defendant

deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of

a chattel without the plaintiff's consent and without lawful justification. . . . A cause of action in

conversion is properly asserted if the plaintiff had actual or constructive possession of a chattel or

an immediate right to possession of a chattel at the time of the alleged conversion.   Money may

be the subject of conversion." Ueberroth v. Goldner, Papandon, Childs & DeLuccia, LLC, No.

Civ.A.11-3119, 2012 WL 834737, at *3 (E.D. Pa. Mar. 12, 2012).  Under Pennsylvania law, the

elements of conversion are: "[(1)] the deprivation of another's right of property, or use or

possession of a chattel, or other interference therewith; [(2)] without the owner's consent; and

[(3)] without legal justification." Universal Premium Acceptance Corp. v. York Bank & Trust

Co., 69 F.3d 695, 704 (3d Cir. 1995) (quotations omitted).  "While courts in other states have

expanded the tort of conversion to apply to intangible property, in Pennsylvania this expansion is

limited 'to the kind of intangible rights that are customarily merged in, or identified with, a

particular document (for example, a deed or a stock certificate).'" Giordano v. Claudio, 714 F.

Supp. 2d 508, 524 (E.D. Pa. 2010) (quoting Apparel Bus. Sys., LLC v. Tom James Co., No.

Civ.A.06-1092, 2008 WL 858754, at *18 (E.D. Pa. Mar. 28, 2008)).

The sole item converted in this case is the LinkedIn account.  Numerous courts, however, have found that items such as software, domain names, and satellite signals are intangible property not subject to a conversion claim.  See, e.g., Apparel Bus. Sys., 2008 WL 858754, at *18–19 ("Software is not the kind of property subject to a conversion claim); DirecTV, Inc. v. Frick, No. Civ.A.03-6045, 2004 WL 438663, at *2–3 (E.D. Pa. Mar. 2, 2004) (finding that satellite signals constitute intangible property which cannot be converted under Pennsylvania law); Famology.com Inc. v. Perot Sys. Corp., 158 F. Supp. 2d 589, 591 (E.D. Pa. 2001) (holding that domain names are not the type of tangible property that may be converted).

As the LinkedIn account is not tangible chattel, but rather an intangible right to access a specific page on a computer, Plaintiff is unable to state a cause of action for conversion. Therefore, the Court finds in favor of Defendant Edcomm on this claim.

### 6.    Tortious Interference With Contract

In her next cause of action, Plaintiff asserts that Defendant Edcomm tortiously interfered with her contract with LinkedIn.  Pennsylvania courts, following the Restatement (Second) of Torts, define the tort of intentional interference with existing contractual relations as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss to the other from the third person's failure to perform the contract.

Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773, 778 (E.D. Pa. 2007) (quoting Restatement (Second) Torts § 766.  In order to prevail on a claim for interference with contractual relations,

18

the plaintiff must plead and prove four elements:  (1) the existence of a contractual relation; (2) the defendant's purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of any privilege or justification on the part of the defendant; and (4) damages resulting from the defendant's conduct.  Gundlach v. Reinstein, 924 F. Supp. 684, 693 (E.D. Pa. 1996).

Although Plaintiff was unable to offer into evidence the contract with LinkedIn to which she agreed when establishing her account, (N.T. 75:7–77:9), the Court can reasonably infer from the existence of her account that Plaintiff had in fact entered into a contractual relationship with LinkedIn.  Moreover, Plaintiff has established that, by entering her account and changing her password, Defendant Edcomm acted with purpose or intent to harm Plaintiff by preventing that relationship from continuing.  Edcomm asserts that it had a privilege to enter Dr. Eagle's account under Edcomm's policy that it "owned" its employees' LinkedIn accounts and could "mine" them for information upon departure of those employees.  As set forth above in the Findings of Fact, however, no such official policy existed.  Moreover, the LinkedIn User Agreement clearly indicated that the individual user owned the account.

Were these the sole elements of the tort, Plaintiff would likely be able to succeed on her cause of action against Edcomm.  A key element of this tort, however, is damages.  Reserving the Court's lengthier discussion of damages for a separate section below, it suffices—for purposes of this section—to conclude that Plaintiff has failed to prove actual legal damage or pecuniary loss flowing from the alleged interference by Edcomm.  Indeed, to date, Plaintiff maintains her contract with LinkedIn.  Thus, the Court finds in favor of Edcomm on this claim.

19

7.      **Civil Conspiracy**

In her seventh remaining cause of action, Plaintiff alleges that all Defendants conspired to

gain unauthorized access to and misappropriate her LinkedIn account.  To state a cause of action

for civil conspiracy, the plaintiff must demonstrate: "(1) a combination of two or more persons

acting with a common purpose to do an unlawful act or to do an lawful act by unlawful means or

for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3)

actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d

Cir. 2003) (citation and internal quotations omitted).  An "'actionable civil conspiracy must be

based on an existing independent wrong or tort that would constitute a valid cause of action if

committed by one actor.'"  Levin v. Upper Makefield Twp., 90 F. App'x 653, 667 (3d Cir. 2004)

(quoting In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999)).

Ultimately, "only a finding that the underlying tort has occurred will support a claim for civil

conspiracy." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008)

(quotation omitted).  Importantly, "[p]roof of malice, *i.e.,* an intent to injure, is essential in proof

of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979).  Malice

requires that the sole purpose of the conspiracy was to injure the plaintiff and that this intent to

injure be without justification. Doltz v. Harris & Assoc., 280 F. Supp. 2d 377, 389 (E.D. Pa.

2003) (emphasis added).  As such, a showing that a person acted for professional reasons, and

not solely to injure the plaintiff, negates a finding of malice. See Bro-Tech Corp. v. Thermax,

Inc., 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009); Thompson Coal Co., 412 A.2d at 472 (noting

that the intent to injure must be without justification, which cannot exist when an act is merely

done "with the intention of causing temporal harm, without reference to one's own lawful gain,

20

or the lawful enjoyment of one's own rights") (quoting <u>Rosenblum v. Rosenblum</u>, 181 A. 583, 585 (Pa. 1935)).

Plaintiff's conspiracy claim fails on multiple grounds.  Primarily, as noted above, Plaintiff has not put forth any evidence regarding any of the actions of any of the individual Defendants. Because the very nature of conspiracy requires "two or more persons," this claim cannot succeed. Moreover, even if claims against the individual Defendants remained, Edcomm and its employees/directors/shareholders cannot legally conspire under the well-established intra-corporate conspiracy doctrine.  <u>Duffy v. Lawyers Title Ins. Co.</u>, No. Civ.A.11-4503, 2012 WL 602192, at *4 (E.D. Pa. Feb. 24, 2012) (noting that it is "well-settled that a corporation cannot conspire with its subsidiaries, its agents, or its employees").  Third, while Plaintiff has established that Defendants acted improperly, she has not proven that the *sole* purpose of the conspiracy was to injure Plaintiff, as opposed to maintaining what Edcomm deemed to be proprietary company information.  Thus, she cannot show the malice element of a conspiracy claim.  Finally, as will again be discussed in more detail below, Plaintiff is unable to prove actual legal damage.  Therefore, Plaintiff shall not be entitled to recover on her civil conspiracy claim.

### 8.   <u>Civil Aiding and Abetting</u>

Finally, Plaintiff alleges a cause of action against the individual defendants for aiding and abetting in the misappropriation of her identity.  "The elements of a claim for common law aiding and abetting are: '(1) that an independent wrong exist; (2) that the aider or abettor know of that wrong's existence and (3) that substantial assistance be given in effecting that wrong.'" <u>Kranzdorf v. Green</u>, 582 F. Supp. 335, 337 (E.D. Pa. 1983) (quoting <u>Walck v. Am. Stock</u>

Exchange, Inc., 687 F.2d 778, 791 (3d Cir. 1982)).

Plaintiff asserts that while only a few of the Defendants took the physical actions necessary to access and misappropriate her LinkedIn account, all Defendants provided substantial assistance and encouragement to the offending Defendants by suggesting that the account be accessed, providing her LinkedIn account password for that purpose, providing Ms. Morgan's photograph for Dr. Eagle's account, and suggesting or drafting changes to Dr. Eagle's LinkedIn account. However, although Plaintiff has clearly established the existence of an independent wrong—i.e., misappropriation of publicity, invasion of privacy, and unauthorized use of name—she has again failed to provide sufficient evidence on which this Court can make any findings as to any of the individual Defendants. For example, while Plaintiff suggested her belief that her assistant, Lisa Arnsperger, provided the password to her LinkedIn account, she offered no first-hand evidence regarding the circumstances of these alleged actions. Indeed, not one of these individual Defendants was called upon to testify in this matter. Judgment on this claim is therefore entered in favor of Defendants.

## 9.   **Compensatory Damages**

Having succeeded on three of her causes of action, the question then becomes the amount of compensatory relief to which Plaintiff is entitled. Through the testimony of Clifford Brody—the co-founder of Edcomm and Plaintiff's current business partner—Plaintiff put forward evidence of prior "deals" she closed for her various companies. She then attempted, through Mr. Brody, to establish a damages calculation caused by the two-week complete loss of her LinkedIn account and approximate three-month partial loss of access to messages on

22

LinkedIn.   As set forth in detail above, Plaintiff, through Mr. Brody, used her average sales per year divided by the number of contacts she maintained on LinkedIn to arrive at a dollar figure per contact, per year.   She then divided that dollars per contact per year figure by four to represent that for one-quarter of the year, or approximately three months, she did not have full access to her LinkedIn account.   Based on those calculations, Plaintiff arrived at a damages figure of somewhere between $248,000 and $500,000 depending on the annual sales figure used.

Under Pennsylvania law, lost profits may be recovered when: (1) there is evidence to establish the damages with reasonable certainty; (2) they were the proximate cause of the alleged wrong; and (3) they were reasonably foreseeable.   See Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991); Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983).   "While a plaintiff's proof of damages need not be mathematically precise, the evidence must establish the fact of damages 'with a fair degree of probability.'"   Mun. Revenue Serv., Inc. v. Xspand, Inc., 700 F. Supp. 2d 692, 711 (M.D. Pa. 2010) (quoting Advent, 925 F.2d at 680 (further citations omitted)).   The law requires that a "claim for damages . . . be supported by a reasonable basis for calculation; mere guess or speculation is not enough."   Stevenson v. Econ. Bank of Ambridge, 197 A.2d 721, 727 (Pa. 1964).   "If the facts afford a reasonably fair basis for calculating how much plaintiff's entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation."   AMCO Ins. Co. v. Emery & Assoc., Inc., No. Civ.A.09-904, 2013 WL 625436, at *11 (W.D. Pa. Feb. 20, 2013) (quoting Kaczkowski v. Bolubasz, 421 A.2d 1027, 1030 (Pa. 1980) (further quotations omitted)).

In the present matter, Plaintiff's request for damages is legally insufficient in multiple respects.   Primarily, Plaintiff has not established *the fact* of damages with reasonable certainty.

23

Aside from her own self-serving testimony that she regularly maintained business through LinkedIn, Plaintiff failed to point to one contract, one client, one prospect, or one deal that could have been, but was not obtained during the period she did not have full access to her LinkedIn account.  Indeed, the very real possibility exists that even with full access to her LinkedIn account, she would have not made any deals with any of her contacts during the time period in question.  This possibility negates her ability to establish the fact of damages with a "fair degree of probability."

Moreover, even if Plaintiff had made a showing of a "fair probability" that she sustained some damages during the loss of her LinkedIn account, she failed to provide a reasonably fair basis for calculating such damages.  While the Court is certainly cognizant of Plaintiff's *pro se* status and financial limitations on retaining a damages expert, we remain equally aware that Plaintiff originally pursued this lawsuit under the learned guidance of counsel and was well aware of her burden to establish her damages.  Yet, Plaintiff chose only to present Clifford Brody who, prior to trial, had never been identified as an expert witness and, during trial, was never properly qualified as an expert in the area of damages.  Thereafter, Mr. Brody, without referencing any documentation, reports, or other financial figures, "guesstimated"  Plaintiff's annual sales over the last five years based on his weekly analysis of sales numbers in the various companies with which he worked with Dr. Eagle.  Mr. Brody offered no concrete foundation for these numbers.  More importantly, Mr. Brody failed to connect Dr. Eagle's successful sales with any use of LinkedIn, even conceding at one point that when Edcomm was first started, "[t]here was no online."  (N.T. 128:6–8.)  He further admitted that during Dr. Eagle's highest sales years, she was not even using LinkedIn, meaning that her success was not predicated on the availability

of this resource.  (N.T. 138:16–140:16.)  Subsequently, using a methodology that seemingly has

no basis in general accounting principles, he took Plaintiff's lowest year of sales and divided that

number by the number of contacts that Dr. Eagle maintained in her LinkedIn account (again a

figure that was not documented in any papers, printouts, or testimony from a LinkedIn employee)

to arrive at a profit per contact per year number.  He again made no efforts to account for the fact

that some of these contacts may have generated sales regardless of the availability of the

LinkedIn account.  Moreover, he worked of the mere assumption that each of these contacts

would have unfailingly generated a certain amount per year.  Thereafter, using her "average"

sales figure per year, in lieu of her "lowest" sales figure, he doubled her damages amount to

$496,000.  Even the most liberal review of this mathematical calculation and its underlying

numbers reveal it to be nothing more than creative guesswork based on mere speculation.

Finally, and perhaps most importantly, even if Plaintiff could prove some damages, she

fails to connect such damages with Defendant's actions.  For the period of June 20, 2011 to July

6, 2011, the period during which Edcomm maintain exclusive control over Eagle's LinkedIn

account, Plaintiff cannot even name, let alone document, a single lost customer, deal, or

transaction.  Although the Court is aware of the hardship in Plaintiff's efforts to prove who

attempted to contact her during this time period when no records were maintained, the Court

nonetheless notes that any reasonable person seeking Dr. Eagle and aware of her self-proclaimed

prompt responsiveness would have sought out other ways to reach her or, at a minimum,

informed her that they had tried to reach her.  Yet, not one individual or company was identified

at any point in this litigation.  This is particularly troubling in light of clear fact that Edcomm

very publicly indicated that Dr. Eagle was no longer affiliated with Edcomm.

25

As for the period from July 6, 2011 to October 7, 2011, when Plaintiff claims she had access to her LinkedIn account, but was still not receiving messages, the Court fails to see how that loss is attributable to any actions of Defendant.  From July 6, 2011, Defendant no longer had any control over the account.  Any inability of Plaintiff to fully access it or to receive certain messages resulted from LinkedIn's own failure to restore the account to Plaintiff.  Other than change the password and modify the information on the home page, Plaintiff has identified no other action by Defendant Edcomm that would have disrupted the functioning of the account or prevented Plaintiff from fully using it once she was re-granted access to it.

In sum, while Plaintiff has clearly identified some tortious and statutory wrongdoing on the part of Defendant Edcomm, she bears the additional burden of establishing with some reasonable certainty the damages she sustained from that wrongdoing.  Despite the lengthy discovery period on this case, despite her retention of counsel for a substantial amount of time, and despite this Court's prior grant of an extension of time for the sole purpose of the allowing Plaintiff to issue trial subpoenas to potential witnesses, Plaintiff has simply failed to put forth any legally sufficient evidence on which this Court can award any damages.  Accordingly, while finding that Defendant is liable on three causes of action, the Court must award Plaintiff compensatory damages of $0.[6]

---

[6] In her Proposed Findings of Fact and Conclusions of Law, Plaintiff claims an entitlement to legal fees as part of the direct damage caused by Defendants' action.  At trial, however, Plaintiff submitted no evidence in support of her claim for legal fees.  Indeed, only after trial and after oral argument on the Proposed Findings of Fact and Conclusions of Law did Plaintiff submitted a self-created chart listing her legal fees.  This chart, aside from not being admitted into evidence, was never substantiated with bills from any of the law firms listed.  Accordingly, the Court declines to consider it and will not award any legal fees.

10.    **Punitive Damages**

In her Complaint, Pretrial Memorandum, and Proposed Findings of Fact and Conclusions of Law, Plaintiff also seeks punitive damages.  The standard for awarding punitive damages under Pennsylvania law is well-established:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others . . . [a]s the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct.

Hutchinson v. Lundy, 870 A.2d 766, 770 (Pa. 2005) (quotations omitted).  "A defendant acts recklessly when 'his conduct creates an unreasonable risk of . . . harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent.'"  Id. at 771 (quoting Restatement (Second) of Torts § 500).

In the present case, the Court could certainly make a reasonable inference that Defendant Edcomm's actions were taken with the direct intent to harm Plaintiff and impede her ability to compete in the banking education industry.  By the same token, however, the Court could just as easily make a reasonable inference that Defendant Edcomm's actions were taken under a well-intentioned belief that the LinkedIn account and its contents belonged to Edcomm and that, in light of Plaintiff's willing surrender of her password to her assistant, it was entitled to enter the account upon her departure and alter the account as it saw fit.  At the end, Plaintiff bears the burden of proving by a preponderance of the evidence that her theory—that of maliciousness and reckless indifference on the part of Edcomm—is, in fact, the correct theory.  Nonetheless, at trial, Plaintiff failed to call any Defendant, any other employee of Edcomm, or anyone with any personal knowledge of the events surrounding the taking of Eagle's LinkedIn account who could

27

provide some evidence, be it direct or circumstantial, regarding the Defendants' state of mind and the circumstances under which these events occurred.  All evidence being equal, the Court must find in favor of Defendant on the punitive damages claim.

> **B.**     **Defendant Edcomm's Counterclaims**

> **1.**     **Misappropriation**

Edcomm first contends that Eagle misappropriated the LinkedIn account as her own.  The tort of misappropriation of an idea has only two elements: (1) the plaintiff had an idea that was novel and concrete and (2) the idea was misappropriated by the defendant.  Blackmon v. Iverson, 324 F. Supp. 2d 602, 607 (E.D. Pa. 2003).  To determine whether an idea has been misappropriated, Pennsylvania courts look to the three elements of common law misappropriation:

> (1) the plaintiff "has made substantial investment of time, effort, and money into creating the thing misappropriated such that the court can characterize the 'thing' as a kind of property right," (2) the defendant "has appropriated the 'thing' at little or no cost such that the court can characterize the defendant's actions as 'reaping where it has not sown,' " and (3) the defendant "has injured the plaintiff by the misappropriation."

Riordan v. H.J. Heinz Co., No. Civ.A.08-1122, 2009 WL 4782155, at *8 (W.D. Pa. Dec. 8, 2009) (quoting Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., 35 A.2d 712, 716 (Pa. Super. Ct. 1999) (further quotations omitted)).

Edcomm argues that in May 2009, Edcomm decided to use LinkedIn as an indispensable sales and marketing tool and initiated a process by which its management would approve the content of Edcomm employee's LinkedIn accounts.  To that end, Edcomm invested substantial time and effort into its employees' LinkedIn account and their development of contacts on those

accounts.  As such, it claims that Eagle's re-acquisition of her account on July 14, 2011 constituted a misappropriation of Edcomm's idea.

In light of the aforementioned Findings of Fact, however, the Court must disagree. Edcomm never had a policy of requiring that its employees use LinkedIn, did not dictate the precise contents of an employee's LinkedIn account, and did not pay for its employees' LinkedIn accounts.  Indeed, as noted above, the LinkedIn User Agreement expressly states that Plaintiff's account is between LinkedIn and the individual user.  Edcomm did not itself maintain any separate account.  Moreover, Edcomm failed to put forth any evidence that Eagle's contacts list was developed and built through the investment of Edcomm time and money as opposed to Eagle's own time, money, and extensive past experience.  Accordingly, the Court finds in favor of Eagle on this claim.

### 2.    <u>Unfair Competition</u>

Defendant Edcomm's final counterclaim — unfair competition — asserts that Eagle improperly misappropriated the content and connections of the LinkedIn account and has improperly used that content to actively and directly compete with Edcomm.

Although Pennsylvania law traditionally defines unfair competition as the "passing off" of a rival's goods as one's own, thus creating confusion between one's own goods and the rival's goods, <u>Scanvec Amiable Ltd. v. Chang</u>, 80 F. App'x 171, 180 (3d Cir. 2003), the doctrine of unfair competition in Pennsylvania has been extended to other types of conduct.  <u>Granite State Ins. Co. v. Aamco Transmissions, Inc.</u>, 57 F.3d 316, 319 (3d Cir. 1995) (citing <u>Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy</u>, 203 A.2d 469, 473 (Pa. 1964)).  "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is

29

evidence of, among other things, trademark, trade name, and patent rights infringement,

misrepresentation, tortious interference with contract, improper inducement of another's

employees, and unlawful use of confidential information." Synthes (U.S.A.) v. Globus Med.,

Inc., No. Civ.A.04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005) (citations omitted).

The Pennsylvania common law tort of unfair competition is coextensive with the definition set

forth in the Restatement (Third) of Unfair Competition. See Bldg. Materials Corp. of Am. v.

Rotter, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa. 2008) (citations omitted); ID Sec, Sys. Of Canada,

Inc. v. Checkpoint Sys., Inc., 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003). Section 1 of the

Restatement[7] indicates that, "[a]s a general matter, if the means of competition are otherwise

tortious with respect to the injured party, they will also ordinarily constitute an unfair method of

competition." Restatement (Third) of Unfair Competition § 1 cmt. g. "The Pennsylvania

---

[7] The Restatement (Third) of Unfair Competition provides, in relevant part, as follows:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:

(1) deceptive marketing, as specified in Chapter Two;

(2) infringement of trademarks and other indicia of identification, as specified in Chapter Three;

(3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four;

or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public. . . .

Restatement (Third) of Unfair Competition § 1.

30

Supreme Court has noted that in addition to the traditional scope of 'unfair competition' . . . the concept has been extended in some business settings to include misappropriation as well as misrepresentation." Hill v. Best Med. Int'l, Inc., Nos. Civ.A.07-1709, 08-1404, 09-1194, 2011 WL 5082208, at *17 (W.D. Pa. Oct. 25, 2011) (citing Pottstown Daily News Publ'g Co. v. Pottstown Broad. Co., 192 A.2d 657, 662 (Pa. 1963)).

As detailed above, Defendant's Counterclaim Complaint has no other cognizable claim for relief.  Its only other remaining counterclaim cause of action—misappropriation—has not been adequately proven by Defendant.  Because Edcomm's unfair competition claim rests entirely on the misappropriation allegations, and because the evidence presented in support of those allegations fails to show Edcomm's entitlement to relief, the unfair competition claim likewise fails.  Thus, the Court enters judgment in favor of Plaintiff on this claim.

## III.   CONCLUSION

Overall, the outcome of this case results in a somewhat mixed bag for both sides.  First, as to the individual Defendants, Plaintiff has failed to establish any tort liability against any of them.  Second, with respect to Plaintiff's claims against Defendant Edcomm for identity theft, conversion, tortious interference with contract, civil conspiracy, and civil aiding and abetting, Plaintiff has failed to meet her burden of proving all elements of these claims by a preponderance of the evidence.  Third, as to her claims for unauthorized use of name in violation of 42 Pa.C.S. § 8316, invasion of privacy by misappropriation of identity, and misappropriation of identity, the Court finds that Plaintiff has successfully proven her claims such that Defendant Edcomm is liable on these causes of action.  Plaintiff has not, however, put forth any legally sufficient evidence of compensatory damages that were causally connected to Defendant's improper

31

activity, nor has she proven her entitlement to punitive damages.  Finally, the Court holds that

Defendant Edcomm has not met its burden on proof on either of its remaining counterclaims.

     An appropriate Judgment Order follows.